# EXHIBIT A

Transitional Workforce Division
Operations Unit
FY06 EARN Center Payment Schedule

**DRAFT**

*Please fill in only the grey shaded areas.*

**Provider Name**

**Program**

EDSI   EARN Center

|  | Contract | Goals |
|---|---|---|
| Enrollments *(Not to exceed 1500)* | 1,500 | |
| Program Participation *(80% of Enrollments)* * | 1,200 | |
| Job Placement *(60% of Program Participation)* | 720 | |
| 6-month Job Retention *(60% of Job Placements up until 12/31/05- presume 220 Jobs)* | 132 | |
| 3-month Job Retention *(75% of 250, which is the expected goal of Job Placements  1/01/06-3/31/06 )* | 188 | |
| Referral to JSS, Higher Education, ISI *(10% of Program Participation)* | 120 | |
| Successful Completion of Training or Active until 60N *(50% of referrals)* | 60 | |

*required hours are 20 and do not start measuring until code 08 (assessment) closes

New Enrollments: 1500

| | | |
|---|---|---|
| Original FY'06 Contract Amount | $ | 407,768 EDSI |
| Allowable FY'05 Carryover Amount | | |
| New FY'06 Contract Amount | $ | |
| Less Cost Reimbursement Line Items | | |
| Supportive Services and Incentives | $ | 386,400 |
| PWE Wages, Fringes and ABAWD Stipends | $ | 314,225 |
| Wage Subsidy | | |
| **Operational Budget** | $ | 2,007,892 |

| | | |
|---|---|---|
| Cost Reimbursement | $ | |
| *10% of Operational Budget* | | |
| Performance Based (Hold back) | $ | 860,525 |
| *90% of Operational Budget* | | |

**Hold-Back Percentage Breakdown**

revised payments

| | | | | |
|---|---|---|---|---|
| Program Participation | $ | 86,053 | Cost Per 1/2 year   $ | 43,026.25 |
| *10% of Holdback Amount* | | | | |
| Job Placement | $ | 430,263 | Cost Per JC   $ | 597.59 |
| *50% of Holdback Amount* | | | | |
| Job Retention | $ | 301,184 | | |
| *35% of Holdback Amount* | | | | |
| 6 month Job Retention | $ | 180,710 | Cost Per JC   $ | 1,369.02 |
| *60% of Retention Payment* | | | | |
| 3 month Job Retention | $ | 120,474 | Cost Per JC   $ | 642.53 |
| *40% of Retention Payment* | | | | |
| Successful Completion of Training or active until 60N | $ | 43,026 | Cost Per JC   $ | 717.10 |
| *5% of Holdback Amount* | | | | |
| **Total** | $ | 860,525 | | |

| | | |
|---|---|---|
| Cost Per Enrollment | $ | 2,379.36 |
| Cost Per Placement | $ | 4,957.00 |

**Payment Frequency:**

Program Participation - twice a year
Job Placement - Quarterly
Job Retention - Quarterly
Successful Completion - Quarterly
All cost reimbursement items will be paid
monthly based on invoices submitted and
supporting documentation.

**Notes:**

West Philadelphia EARN Center
EXPENSE BREAKDOWN
For The Period July 1, 2005 thru June 30, 2006

| | ORIGINAL BUDGET | ORIGINAL BUDGET LESS 1/01/06 TO 6/30/2005 | NEW BUDGET 70 % COST REIMBURSED | NEW BUDGET WITH ALL PERFORMANCE EARNED | TOTAL COSTS 7/1/2005 to 2/28/06L | COSTS REMAINING | Encumbered @ 4/3/06 | Unpaid @ 4/3/06 |
|---|---|---|---|---|---|---|---|---|
| SUB-CONTRACTS | | | | | | | | |
| Caring People Alliance | $1,511,396.00 | $1,430,430.35 | $916,884.11 | $1,309,489.96 | $639,318.24 | $277,365.87 | $639,318.24 | $639,318.24 |
| TOTAL PROGRAM SERVICES | $3,823,030.00 | $3,133,335.15 | $2,007,982.09 | $2,888,417.14 | $2,047,792.00 | $102,594.02 | | |

<u>Meeting with EPSI</u>

Contract with PWBC

Contract changed: 70% to Cost Recovery
                  30% to Performance Based

Benchmark: Withdrawn for portion of Contract
Job              Pay out 2 different ways
        Retain   80%

Plan to be 60K less

3 mo. retain: Must solid
Training: OK

If funds are available
will pay us over
estimate - to make up
(of 05 cuts)

Not be able to Compare
Total budget of $'s  -  What do to get here?

July 1 - go to 50/50  =  Fast Blended charge?
           35/1 - Give work to Clients

* ** Blended rate for Computer Literacy

*(handwritten notes — partially legible)*

PWPC Content → PWPC

Cut / Retain Based
70/30
→ 70% of when the budget was
→ Expense Based = 30%

Benchmark: Withdraw for patient of Content.

Job Retention = Payout of different orgs

Retain : 80%

Recent (60K) less

3 mo. return = Most solid

Timing = OK

86
86   Plant
80   Relation

Will once small
(If finish one decide
will pay less or
once decline.)

932
70
862
240
622 → / Total Out of 80 = / What is to get here.

July 1 = go to 50/50 — Fast Plant closures
              35/1   lose work to Clarke.

PWPC   Blended rate for Computer literacy

# EXHIBIT B

June 6, 2006


Arlene Bell
Executive Director
Caring People Alliance
1819 JFK Boulevard
Suite 220
Philadelphia, PA 19103

Dear Ms. Bell:

Educational Data Systems, Inc. is required to submit a final invoice to PWDC by the end of July.   Because of this, we will need to receive your final invoice no late than July 20, 2006.  The fiscal year ends June 30th and this will ensure that everything is in order to close out the grant.

If you have any questions or concerns, please contact Mark Pressey at 313-271-2660 or by e-mail at mpressey@edsincorporated.com.

It has been a pleasure working with your organization and we appreciate all the contributions you have made to create a highly successful EARN Center.

Sincerely,



W. Robert Schnieders
President

# EXHIBIT C

October 24, 2006

William Hastings
Caring People Alliance
1819 JFK Blvd., Suite 220
Philadelphia, PA 19103

Dear. Mr. Hastings:

Enclosed, please find a check for $139,398.13.  The information below details final EARN Center payments for the year ending June 30, 2006. Payments were based on the total funding EDSI received to disburse on a cost reimbursed basis (column b), and the amount of performance based money (column e) that was earned for the year. The total shortfall in funding we experienced was $1,063,519.84.  Thank you.

| Subcontractor | A<br>New<br>Budget<br>12 month | B<br>70% of<br>Budget | C<br>Total<br>Invoices<br>Received | D<br>Total<br>Invoices<br>Paid | B-D<br>Unpaid<br>Balance<br>of 70 % | E<br>Prorated<br>Performance<br>Payment | E+B-D<br>Final Payout |
|---|---|---|---|---|---|---|---|
| CPA | $   826,209.00 | $   578,346.30 | $   826,209.00 | $   563,123.50 | $   15,222.80 | $ 124,175.33 | $ 139,398.1 |

| | | |
|---|---|---|
| Potential benchmark payments | $ | 860,000.00 |
| Benchmark payments received | $ | 619,308.00 |
| Benchmark payment shortfall | $ | (240,692.00) |
| | | |
| Additional Enrollment Money E | $ | 1,372,827.84 |
| Additional Enrollment Money F | $ | 550,000.00 |
| Enrollment Shortfall | $ | (822,827.84) |
| | | |
| Total Shortfall in funding | $ | (1,063,519.84) |

Sincerely,

W. Robert Schnieders
President

# EXHIBIT D

## W. Robert Schnieders

**From:**    Jennifer Sarkisian
**Sent:**    Thursday, October 26, 2006 4:27 PM
**To:**      W. Robert Schnieders
**Subject:** Voice Mail Message

Bob,

Mark left you a voice mail message.  He wanted to tell you about a conversation he had with
CPA today.  They were asking about why the check was so low.  He explained how it was
calculated.  He told them that the original numbers that were given were on the high side - we
were shorted money.  Had we earned the original amount, there would not have been a
problem.  They were very disappointed and asked if the change in the budget was ever
communicated to anyone.  He said that you had talked with the Directors about the change.

I left the voice mail message on your machine in case you want to listen to it.

**Jennifer Sarkisian**
**Administrative Assistant to W. Robert Schnieders**
**Educational Data Systems, Inc.**
**313-271-2660 Ext. 119**
**jsarkisian@edsincorporated.com**

**EXHIBIT E**

1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

CARING PEOPLE ALLIANCE        :  CIVIL ACTION

    Plaintiff,        :

    -vs-        :

EDUCATIONAL DATA        :
SYSTEMS, INC.        :

    Defendant.        :  NO. 07-CV-1267

February 14, 2008
Philadelphia, Pennsylvania

- - -

    Oral deposition of ARLENE BELL,
ESQUIRE, taken pursuant to Notice, held in the
offices of Caring People's Alliance, 1819 John F.
Kennedy Boulevard, Suite 220 at 10:00 a.m., on the
above date, before Janice Philomena Vanore, a
Professional Shorthand Reporter and Notary Public of
the Commonwealth of Pennsylvania.

- - -

EAST COAST LEGAL SUPPORT, LLC

28 Levering Circle
Bala Cynwyd, Pennsylvania 19004
(610) 664-3036
(610) 664-3041 (fax)

————— EAST COAST LEGAL SUPPORT, LLC —————

---

2

APPEARANCES:

LAW OFFICES OF ECKERT, SEAMANS, CHERIN & MELLOTT,
LLC
BY:  DYLAN J. WALKER, ESQUIRE
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, Pennsylvania 19102

Attorney for the Plaintiff

LAW OFFICES OF SPECTOR, GADON & ROSEN, P.C.
BY:  NANCY ABRAMS, ESQUIRE
1635 Market Street, 7th Floor
Philadelphia, Pennsylvania 19103

Attorney for the Defendant

————— EAST COAST LEGAL SUPPORT, LLC —————

---

3

- - - - -
INDEX
- - - - -

WITNESS:                                    PAGE

    ARLENE BELL, ESQUIRE

    BY:  Ms. Abrams                          4

EXHIBITS

NUMBER                                      PAGE

BELL-1                                       22

BELL-2                                       25

BELL-3                                       41

————— EAST COAST LEGAL SUPPORT, LLC —————

---

4

————— BELL —————

1          (It was stipulated by and between

2  counsel that sealing, certification, and filing be

3  waived; and that all objections, except as to the

4  form of the question, be reserved until the time of

5  trial.)

6          ...ARLENE BELL, having been duly

7  sworn, was examined and testified as follows...

8  BY MS. ABRAMS:

9      Q.    Good morning, Ms. Bell.  My name is

10  Nancy Abrams, and I'm one of counsel for Educational

11  Data Systems in this matter, and I'm going to take

12  your deposition today.

13          Have you ever had your deposition

14  taken before?

15      A.    Yes.

16      Q.    How recently?

17      A.    Several months ago.

18      Q.    Okay.  I just want to go through a

19  few ground rules to refresh your recollection of how

20  this whole process works.

21          I'm going to be asking you a bunch

22  of questions, you'll give a bunch of answers, and

23  the court reporter will take down everything

24  everybody says, so it's important you give verbal

————— EAST COAST LEGAL SUPPORT, LLC —————

5

— BELL —

```
 1   answers.  She can't get nods, or shakes of the head,
 2   and uh-huh and uh-uh is also very difficult to get
 3   accurately on the record.  So, if you can, say yes,
 4   no, okay, whatever.
 5              Okay?
 6        A.    Yes.
 7        Q.    Thank you.  Very good.  Also, and
 8   this is the hardest thing at a deposition, while
 9   they are amazing, they can only type so fast, and
10   it's difficult for them to get an accurate record if
11   people are talking on top of one another.
12              So, even if you think you know what
13   I'm asking you, please wait until I'm completely
14   done with the question before you begin your answer,
15   and I will try very hard not to interrupt your
16   answer before I start with my next question.
17              All right?
18        A.    Yes.
19        Q.    Thank you.  If you don't understand
20   a question or if you need clarification, please ask,
21   because if you do give a response, I'm going to
22   assume that you understood the question, and that
23   you're responding to the question that I asked you.
24              Okay?
```

— EAST COAST LEGAL SUPPORT, LLC —

6

— BELL —

```
 1        A.    Yes.
 2        Q.    I don't expect this to be a terribly
 3   long deposition, but if you need to take a break,
 4   and I'm sure that I'll need to take a break at some
 5   point, or you need to speak with counsel, just let
 6   me know.  The only thing I ask is unless there's a
 7   matter of privilege, if there's a question pending,
 8   that you respond to the question before we take a
 9   break or you confer with counsel.
10              Okay?
11        A.    Yes.
12        Q.    Are you on any medication that will
13   hinder your ability to fully understand and respond
14   to my questions today?
15        A.    No.
16        Q.    Is there any other reason why you
17   can't fully understand and respond to my questions
18   today?
19        A.    No.
20        Q.    Very good.  Can you please state
21   your full name for the record?
22        A.    Arlene, A-R-L-E-N-E, F as in Frank,
23   Bell, B-E-L-L.
24              MS. ABRAMS:  And am I correct that
```

— EAST COAST LEGAL SUPPORT, LLC —

7

— BELL —

```
 1   Ms. Bell will be produced for trial if she is needed
 2   for trial and we won't have to subpoena her?
 3              MR. WALKER:  If you need her to
 4   appear for trial, just send me a letter.
 5              MS. ABRAMS:  Then I don't need your
 6   home address.
 7   BY MS. ABRAMS:
 8        Q.    I want to get to know a little bit
 9   about you before we get down to the nuts and bolts
10   of the matter.
11              Do you have post high school
12   education?
13        A.    Yes.
14        Q.    Where did you go to college?
15        A.    Temple University.
16        Q.    Do you have a degree from temple?
17        A.    Yes.
18        Q.    What is that?
19        A.    Bachelor of Science.
20        Q.    In?
21        A.    Sociology.
22        Q.    When did you get your BS?
23        A.    When?
24        Q.    Yes.  About.
```

— EAST COAST LEGAL SUPPORT, LLC —

8

— BELL —

```
 1        A.    I believe January of 1970.
 2        Q.    Do you have any post graduate formal
 3   education?
 4        A.    I do.
 5        Q.    And do you have a post graduate
 6   degree?
 7        A.    I have a JD.
 8        Q.    And where did you go to law school?
 9        A.    Temple University School of Law.
10        Q.    When did you get your JD?
11        A.    1978.
12        Q.    Did you work in between when you got
13   your Bachelors and when you went to law school?
14        A.    Yes.
15        Q.    What did you do in between college
16   and law school?
17        A.    I was a juvenile probation officer.
18   I was a court representative in the juvenile
19   probation department.  I was the protective services
20   worker for children with, what was then, the
21   Department of Public Welfare in Philadelphia.  And
22   also a court representative for that department.
23        Q.    Okay.  After you got your JD, did
24   you go into the practice of law?
```

— EAST COAST LEGAL SUPPORT, LLC —

---

9

— BELL —

```
1        A.      I clerked for two years, for Chief
2   Justice Evan.
3        Q.      And after you clerked?
4        A.      Yes.  I went into the practice of
5   law.
6        Q.      And who did you practice with?
7        A.      The City of Philadelphia, solicitors
8   office.
9        Q.      So, that was from 1980 about?
10       A.      About.
11       Q.      How long were you with the
12  solicitors office, approximately?
13       A.      Approximately a year and a half or
14  two years.
15       Q.      Okay.  And did you go into private
16  practice after the solicitors office?
17       A.      No.  I went to work as legislative
18  aid to Councilman John Street, although I did have,
19  on the side, a small practice.
20       Q.      When you were in the solicitors
21  office, did you concentrate in a particular area of
22  the law?
23       A.      I started in the legislative and
24  counseling area, and then prior to leaving, I was
```

— EAST COAST LEGAL SUPPORT, LLC —

---

10

— BELL —

```
1   chief of appeals.
2        Q.      And how long did you remain
3   legislative aid to John Street?
4        A.      Around four, four and a half years.
5        Q.      And after that what did you do?
6        A.      I went back to the Law Department.
7        Q.      Did you concentrate your practice in
8   the Law Department in any particular area?
9        A.      I started back again in legislation
10  and counseling, and ultimately became chief deputy
11  for commercial litigation.
12       Q.      How long did you remain with the Law
13  Department during that period?
14       A.      I really would need my resume to
15  look at.
16       Q.      I don't need exact dates.  I'm just
17  trying to figure out how you got to where you are.
18       A.      That's a long trail.  I'll say two
19  and a half years.  Truly, I'm guessing.
20       Q.      Okay.  That's fine.
21               And what did you do after this stint
22  with the Law Department?
23               MR. WALKER:  If I can, she doesn't
24  want you to guess.  If you can make a reasonable
```

— EAST COAST LEGAL SUPPORT, LLC —

---

11

— BELL —

```
1   estimate, please do so, but it doesn't do anybody
2   any good for you to sit here and guess.
3   BY MS. ABRAMS:
4        Q.      What did you do after the stint with
5   the Law Department?
6        A.      I was an assistant district
7   attorney.
8        Q.      Did you concentrate in any
9   particular type of cases?
10       A.      Economic crimes.
11       Q.      And approximately how long did you
12  stay with the DA's office?
13       A.      Two years.
14       Q.      And after the DA's office, what did
15  you do?
16       A.      You know, I just realized I
17  transposed.  The DA's office was before the second
18  stint in the solicitors office.
19       Q.      Okay.  So, you were the legislative
20  aid for John Street, then you were an assistant DA,
21  then you went back to the Law Department?
22       A.      Yes.  Yes.
23       Q.      Okay.  Then what did you do?
24       A.      Then I was chief of staff in the
```

— EAST COAST LEGAL SUPPORT, LLC —

---

12

— BELL —

```
1   managing director's office.
2        Q.      Of the City?
3        A.      Yes.
4        Q.      And after that?
5        A.      General counsel at the Pennsylvania
6   Convention Center.
7        Q.      And after that?
8        A.      After that, deputy executive
9   director of the Philadelphia Housing Authority.
10       Q.      When you were deputy executive
11  director of the Housing Authority, did you continue
12  to act as legal counsel?
13       A.      No, I did not.
14       Q.      Okay.  And when you were chief of
15  staff in the managing director's office, did you
16  have any legal duties?
17       A.      No, I did not.
18       Q.      Okay.  After you were deputy
19  executive director of the Housing Authority, what
20  did you do?
21       A.      I spent about ten months consulting.
22       Q.      And, approximately, when was this?
23       A.      About -- roughly ten years ago.
24       Q.      So, about 1998?
```

— EAST COAST LEGAL SUPPORT, LLC —

### 13

— BELL —

1    A.    1998.

2    Q.    And after you consulted for about

3  ten months?

4    A.    I came to this organization as

5  executive director.

6    Q.    And that was in 1999?

7    A.    I think it was 1998 actually.  The

8  latter part of 1998, September.

9    Q.    And have you remained executive

10  director of CPA since that time?

11    A.    As some point, several years ago, we

12  had a reorganization and changed our titles.  So,

13  I'm really -- my title is President/CEO, but I've

14  been the leader of this organization for all that

15  time, yes.

16    Q.    When your title changed during the

17  reorganization, did your basic duties change?

18    A.    No.

19    Q.    Explain for me, generally, what your

20  responsibilities are as President and CEO?

21    A.    My responsibility are the oversight

22  of the entire organization and all of it's

23  activities, working with the board of directors to

24  govern the organization, and anything that those two

— EAST COAST LEGAL SUPPORT, LLC —

### 14

— BELL —

1  major duties entails.

2    Q.    Okay.  And am I correct that your

3  office is here at 1819 JFK Boulevard?

4    A.    That's correct.

5    Q.    Do your duties take you to any of

6  the other sites that CPA operates?

7    A.    Yes, from time to time.

8    Q.    Approximately, how much, what

9  percentage of your time would you estimate you spend

10  at the various sites, as opposed to here at the

11  headquarters?

12    A.    Five percent.

13    Q.    Okay.  How did you first become

14  familiar with Educational Data Systems, Inc.?  I'm

15  going to refer to them as EDSI.

16    A.    A former deputy knew them, had done

17  some work with them, or had some relationship with

18  them, John Candell.

19    Q.    Okay.  When is the first time that

20  your organization entered into any discussions about

21  doing any kind of joint project with EDSI to your

22  knowledge?

23    A.    I don't know.

24    Q.    Did Mr. Candell have initial

— EAST COAST LEGAL SUPPORT, LLC —

### 15

— BELL —

1  discussions with EDSI before you got involved, to

2  your knowledge?

3    A.    That's my understanding, yes.

4    Q.    Okay.  When -- did you have any

5  direct dealing with EDSI prior to the EARN Center?

6    A.    No.

7    Q.    What is the first involvement you

8  had in the EARN Center project?

9    A.    Mr. Macdonald and I had lunch with

10  Mr. Schnieders to just talk about the relationship,

11  the potential for a relationship in the EARN Center.

12    Q.    Okay.  And approximately when was

13  that?

14    A.    I really don't recall.

15    Q.    Was it prior to the beginning of the

16  EARN Center project in early 2005?

17    A.    I don't know what you mean by early

18  2005.

19    Q.    January, February, 2005?

20    A.    It would have been prior to the

21  beginning of the EARN Center project, yes.

22    Q.    Okay.  Did you have any involvement

23  in the decision for CPA to join with EDSI in the

24  EARN Center project?

— EAST COAST LEGAL SUPPORT, LLC —

### 16

— BELL —

1    A.    Yes.

2    Q.    Can you describe that for me,

3  please?

4    A.    Ultimately, it would be my decision

5  whether we were going to collaborate with an outside

6  organization in any contract.

7    Q.    And what was your understanding of

8  the scope of the EARN Center project at the time

9  that you were making the decision whether or not to

10  join with EDSI in the project?

11    A.    What do you mean by "the scope"?

12    Q.    What would CPA be doing as part of

13  the EARN Center project if they joined with EDSI in

14  the project?

15    A.    We would be -- we would have two

16  roles, essentially.  Landlord being one of them,

17  because the EARN Center was going to be cited at our

18  facility in West Philadelphia, and the other would

19  be in the capacity as a subcontractor to provide

20  case management services for those people who are

21  working through the EARN Center.

22    Q.    Did you have any involvement in

23  procuring the staffing for the EARN Center project,

24  the staff that CPA was to provide for the case

— EAST COAST LEGAL SUPPORT, LLC —

### Page 17

— BELL —

1  managers?
2  A.  No.
3  Q.  Who had that responsibility, to your
4  knowledge?
5  A.  I don't really know.  You know, it
6  would've been a number of people involved in hiring
7  people.
8  Q.  But you weren't directly involved in
9  that process?
10  A.  Other than just signing the
11  paperwork.  That would be it.
12  Q.  Okay.  Let me show you --
13  MS. ABRAMS:  And, Dylan, I'm not
14  going to have her remark exhibits that were already
15  marked.  And I actually took the exhibits from the
16  deposition transcript.  So, they're marked.
17  MR. WALKER:  Okay.
18  BY MS. ABRAMS:
19  Q.  Let me show you what we've
20  previously marked as Macdonald-1.
21  And ask if you've ever seen this
22  document before?
23  A.  It appears to be a copy of our
24  contract with EDSI.

— EAST COAST LEGAL SUPPORT, LLC —

### Page 18

— BELL —

1  Q.  And if you look at page 9 of the
2  contract, is that your signature?
3  A.  Yes.
4  Q.  Okay.  I'd like to call your
5  attention to some of the provisions of the contract.
6  If you look at page 3, please, and
7  just read to yourself section 5A, Invoicing.
8  At the time you signed this
9  contract, were you aware of the timeframes in which
10  invoices should be submitted under the terms of the
11  contract?
12  A.  Well, yes, I was.
13  But I really, you know, want to
14  point out that at the time that we signed this
15  contract, or I signed this contract, I wasn't aware
16  there were already late invoices at issue.  I was
17  never made aware of that.
18  Q.  Okay.  So, did you have any
19  involvement in the actual preparation and submission
20  of invoices?
21  A.  Absolutely none.
22  Q.  So, you had no knowledge at the time
23  as to whether invoices were prepared and submitted
24  on a timely basis?

— EAST COAST LEGAL SUPPORT, LLC —

### Page 19

— BELL —

1  A.  No.
2  Q.  Okay.  We don't really need to talk
3  about this then.
4  As part of the contract, was it your
5  understanding that -- let me back up for a minute.
6  I want to talk a little bit about
7  the West Philadelphia facility.  Am I correct that
8  this is a facility that is owned by CPA?
9  A.  Yes.
10  Q.  And what was your understanding of
11  the programs that were operating in that center at
12  the time, just prior to when the EARN Center was
13  established; the programs that were operating in
14  that facility?
15  A.  Child care, after school programs,
16  summer camp, senior program, I really don't recall
17  which clinical programs may or may not have been
18  operating.
19  Q.  Was it -- do you have an
20  understanding as to whether or not that facility was
21  being underutilized just prior to the time the EARN
22  Center was established in the building?
23  MR. WALKER:  Objection to the form.
24  BY MS. ABRAMS:

— EAST COAST LEGAL SUPPORT, LLC —

### Page 20

— BELL —

1  Q.  You can answer.
2  A.  The answer is it depends.  When you
3  run a community center, for example, if you have an
4  after school program, certain rooms may be used
5  during the after school hours, and they may not be
6  being used during the other hours of the day.  So,
7  in that sense, there could be underutilization of
8  the space, yes.
9  Q.  Prior to entering into the EARN
10  Center contract, do you know when the last previous
11  time that renovations had been done to that
12  building?
13  A.  What kind of renovations?
14  Q.  To the physical plant.
15  A.  Major renovations?
16  Q.  Significant painting, repairs --
17  MR. WALKER:  Objection to the form.
18  BY MS. ABRAMS:
19  Q.  -- of the physical plant?
20  A.  Well, there are always repairs going
21  on.  I don't have any specific recollection.
22  You know, if equipment breaks down,
23  and it's repaired, floors are replaced, carpeting is
24  ripped up and tiles are put down.  I mean, those

— EAST COAST LEGAL SUPPORT, LLC —

---

21

— BELL —

1  kinds of things happen intermittently.
2      I don't have any specific
3  recollection of what happened prior to the EARN
4  Center.
5      Q.   Okay.  As part of the contract with
6  EDSI for the EARN Center, was it your understanding
7  that significant renovations would be done to the
8  that building?
9      A.   It wasn't as much renovations as I
10  think modifications to the building.  I mean, I say
11  that to the sense that the building can certainly
12  use a new HVAC system, and that was not part of the
13  contract.
14      The renovations that were done were
15  work that was done to accommodate the additional
16  staff that the EARN Center was going to be having in
17  the building, the work areas for them, and some
18  cosmetic work that needed to be done.
19      And, I believe, there was renovation
20  of our computer lab, because they felt it was not up
21  to their standard, and they wanted to use our
22  computer lab.
23      Q.   Okay.
24      MS. ABRAMS:  Can you mark this,

— EAST COAST LEGAL SUPPORT, LLC —

---

22

— BELL —

1  please, as Bell-1?
2      (Whereupon, a document was marked
3  for identification as Exhibit Bell-1.)
4  BY MS. ABRAMS:
5      Q.   Just take a minute and read through
6  this to yourself.
7      Have you ever seen the document that
8  I marked as Bell-1 before?
9      A.   I don't recall seeing it, no.
10      Q.   I'll represent that this was
11  provided to me by your counsel as part of the
12  documents that the CPA had regarding this matter.
13      Were you involved at all in the
14  discussion of what renovations, including
15  refurnishing, would be in the West Philadelphia
16  Community Center?
17      A.   In the discussions?  No, I was not.
18      Q.   Okay.  Do you have any knowledge as
19  to whether or not the renovations and purchases
20  indicated in this document were actually made and
21  done?
22      A.   Well, I would not say I have
23  knowledge of each and every one, but I know that new
24  furniture was purchased, I know that area in the

— EAST COAST LEGAL SUPPORT, LLC —

---

23

— BELL —

1  lobby was reconstructed to create work stations, and
2  many of these things.  There was a divider placed in
3  the cafeteria.  I'm sure there was painting and some
4  carpeting.
5      I can't — I know there was a lot of
6  discussion around the phone lines and computer
7  lines, and I don't know the details of that.
8      Q.   Okay.  So, you weren't involved in
9  any issues that arose regarding the T1 line, and the
10  phone system, and everything else?
11      A.   No.
12      Q.   Okay.  The invoices submitted by CPA
13  indicate that a total of $156,860.11 were spent on
14  construction.
15      Do you have any reason to believe
16  that that's not correct?
17      MR. WALKER:  Objection to form.
18      THE WITNESS:  No.
19  BY MS. ABRAMS:
20      Q.   Okay.  And, to your knowledge, the
21  — am I correct that any renovations to the physical
22  space obviously remained at the West Philadelphia
23  Community Center?
24      MR. WALKER:  Objection to form.

— EAST COAST LEGAL SUPPORT, LLC —

---

24

— BELL —

1      THE WITNESS:  Renovations?
2  BY MS. ABRAMS:
3      Q.   The painting, the carpeting.
4      A.   Of course.
5      Q.   To your knowledge, did the furniture
6  that was purchased for the EARN Center remain at the
7  West Philadelphia Community Center?
8      MR. WALKER:  Objection to the form.
9      THE WITNESS:  As far as I know, some
10  of it did, and some of it did not.
11  BY MS. ABRAMS:
12      Q.   But you don't know any specifics?
13      A.   No.
14      Q.   Okay.  Were you aware in — that an
15  outside group MD Openheim and Company did an audit
16  of the accounting systems and controls?
17      MR. WALKER:  Objection to form.
18      THE WITNESS:  No.
19  BY MS. ABRAMS:
20      Q.   Let me show you what was previously
21  marked as Terrell-1.
22      You don't have to read through it,
23  specifically, but let me just ask you whether —
24  look through it briefly, and let me know whether

— EAST COAST LEGAL SUPPORT, LLC —

25

— BELL —

1   you've ever seen this document?

2      A.   No.

3      Q.   Did you become aware, at any time,

4   of any corrective actions that were requested

5   regarding the way that invoices and supporting

6   documentation were provided?

7           MR. WALKER:  Objection to form.

8           THE WITNESS:  No.

9           MS. ABRAMS:  Mark this, please, as

10   Bell-2.

11          (Whereupon, a document was marked

12   for identification as Exhibit Bell-2.)

13   BY MS. ABRAMS:

14      Q.   Can you just read through this to

15   yourself, please?

16          Do you recall meeting with

17   Mr. Schnieders and Mr. Macdonald regarding any

18   issues that are listed in this?

19          MR. WALKER:  Hold on.  Has she had a

20   chance to review this?  Does she feel comfortable

21   that she's looked through it?

22          MS. ABRAMS:  Well, she read through

23   it, closed it, and looked up.

24   BY MS. ABRAMS:

— EAST COAST LEGAL SUPPORT, LLC —

26

— BELL —

1      Q.   I'm sorry if I assumed, but have you

2   thoroughly reviewed the document?

3      A.   I've reviewed it.

4      Q.   Do you recall meeting with

5   Mr. Schnieders and Mr. Macdonald regarding any of

6   the issues listed in this e-mail?

7      A.   No.

8      Q.   Do you recall having any meetings

9   with Mr. Schnieders about any safety, or space, or

10   staff, or equipment issues at the EARN Center?

11          MR. WALKER:  Objection to form.

12          THE WITNESS:  I believe I had a

13   phone conversation with Mr. Schnieders about some of

14   his issues.

15   BY MS. ABRAMS:

16      Q.   But you don't recall actually having

17   a meeting with Mr. Macdonald and Mr. Schnieders?

18      A.   No.

19      Q.   Okay.  Are these -- at the time, are

20   these the types of issues that Mr. Macdonald, it

21   would've been his responsibility to address these

22   issues?

23      A.   Yes.

24          MR. WALKER:  Objection to the form.

— EAST COAST LEGAL SUPPORT, LLC —

27

— BELL —

1   BY MS. ABRAMS:

2      Q.   Do you know whether or not Mr.

3   Macdonald actually met with Mr. Schnieders regarding

4   these issues?

5      A.   I don't know.

6      Q.   Okay.  Did you ever see a copy of

7   this e-mail?

8      A.   I don't recall ever seeing this

9   e-mail.

10      Q.   Okay.  Do you recall any issues

11   arising in June of 2005 regarding the use of space

12   in that facility because of the summer program?

13      A.   I don't know when those issues came

14   up, but it's a logical time for a summer program

15   issue to come up.  I think this were some dispute

16   about one hour in the day in certain areas of the

17   building, but we had already agreed on sharing of

18   times.  And, essentially, we stuck to what we had

19   agreed to.

20      Q.   Let me show you what was previously

21   marked as Macdonald-2.  If you can just read that to

22   yourself, please.

23          Have you reviewed the document?

24      A.   Yes.

— EAST COAST LEGAL SUPPORT, LLC —

28

— BELL —

1      Q.   Have you ever seen these string of

2   e-mails before?

3      A.   No.

4      Q.   Okay.  Do you recall having

5   conversations with Mr. Schnieders regarding the

6   space usage for the summer program?

7      A.   Yes.

8      Q.   And does his characterization of

9   those conversations to Mr. Macdonald accurately

10   reflect your conversations?

11          MR. WALKER:  Objection to form.

12          THE WITNESS:  I really don't

13   remember this kind of detail.  I know that we rented

14   space offsite that summer, and took children back

15   and forth to another place because we couldn't

16   accommodate them in our building.

17   BY MS. ABRAMS:

18      Q.   Okay.  Do you recall any issues

19   coming up with the interaction between Ms. Falcone

20   and Brenda Terrell?

21      A.   Yes.

22      Q.   And did you have any involvement in

23   the resolution of those issues?

24      A.   Ultimately, I did.

— EAST COAST LEGAL SUPPORT, LLC —

**29**

— BELL —

```
 1          Q.      Let me show you what was previously
 2   marked as Macdonald-3.
 3          Do you recall seeing this e-mail
 4   when it was sent?
 5          A.      Not really, but I'm copied on it.
 6          Q.      Okay.  What do you recall of the
 7   issues that is arose between Ms. Falcone and
 8   Ms. Terrell?
 9          A.      What I recall is there were issues
10   about the daily meetings that occurred at 8:00 a.m.
11   and CPA employees didn't begin work at 8:00 a.m.
12          When they were hired, they weren't
13   given those hours as their hours of work in their
14   hiring information.  Other than that, I would have
15   to say in the general sense that there seemed to be
16   some friction between Ms. Falcone and Ms. Terrell
17   around various aspects of who people reported to,
18   were they CPA employees reporting to Ms. Falcone or
19   were they reporting to Ms. Terrell.  Things of that
20   nature.
21          Q.      Okay.  And you indicated that you
22   ultimately had a role in resolving those issues?
23          A.      Yes.  I left it to other people to
24   resolve those issues.  However, as time went by, and
```

— EAST COAST LEGAL SUPPORT, LLC —

**30**

— BELL —

```
 1   things didn't seem to improve, I decided we needed
 2   to have some change in our staffing in an attempt to
 3   find somebody who could have a better working
 4   relationship with Ms. Falcone, and so I selected
 5   somebody to do that.
 6          Q.      And as a result of that decision,
 7   was Ms. Terrell terminated?
 8          A.      I believe Ms. Terrell left.
 9          Q.      Okay.  And who did you select to
10   take over those duties?
11          A.      Gwen Price.
12          Q.      Okay.  Do you also recall issues
13   arising regarding staffing at the EARN Center?  The
14   fact that the EARN Center was having -- was not
15   being fully staffed?
16          MR. WALKER:  Objection to the form.
17          THE WITNESS:  Well, I mean, in the
18   beginning, when we were hiring, it wasn't fully
19   staffed.  So, if that was an issue because people
20   didn't -- who hadn't been hired yet, didn't go to
21   the trainings that had been established because they
22   hadn't been hired yet.
23          And, also, toward the latter part of
24   the contract, we began not replacing workers because
```

— EAST COAST LEGAL SUPPORT, LLC —

**31**

— BELL —

```
 1   it didn't make any sense for us to be hiring people
 2   when we were going to be out of the contract in a
 3   number of months.  It would make more sense for EDSI
 4   to hire those people.
 5   BY MS. ABRAMS:
 6          Q.      Whose responsibility was it to hire
 7   the staff for the EARN Center, if you know?
 8          MR. WALKER:  Objection.  Asked and
 9   answered.
10          THE WITNESS:  When you say, "the
11   EARN Center," do you mean the whole EARN Center or
12   our portion?
13   BY MS. ABRAMS:
14          Q.      For your portion of it.
15          A.      It would have been Ms. Terrell, and
16   then after that, Ms. Price.
17          Q.      You indicated that people weren't
18   available to go to the training because they hadn't
19   been hired yet?
20          A.      Yes.
21          Q.      Was it your understanding that the
22   hiring was not completed in a timely manner?
23          MR. WALKER:  Objection to form.
24          THE WITNESS:  No.  No.
```

— EAST COAST LEGAL SUPPORT, LLC —

**32**

— BELL —

```
 1   BY MS. ABRAMS:
 2          Q.      Okay.  Do you recall issues arising
 3   regarding how the case management was being done,
 4   whether it was sufficient for the needs of the
 5   program?
 6          MR. WALKER:  Objection to the form.
 7          THE WITNESS:  No.  I don't remember
 8   taking that form.
 9   BY MS. ABRAMS:
10          Q.      Okay.  I'll show you what was
11   previously marked as Terrell-2.
12          Do you recall receiving this e-mail?
13          A.      No, but I am copied on it.
14          Q.      I'd like to direct your attention to
15   the second paragraph, about the middle, it says,
16   "Beginning July 1 of this fiscal year, the contract
17   is being converted from a cost reimburse to
18   performance based design."
19          Do you see that?
20          A.      Yes.
21          Q.      What is your understanding of the
22   import of that?
23          MR. WALKER:  Objection to the form.
24          THE WITNESS:  Well, it's not
```

— EAST COAST LEGAL SUPPORT, LLC —

---

— BELL —

33

1 specific.  It's not specific because it doesn't give
2 any percentages or any solid information about what
3 this conversion is.
4 BY MS. ABRAMS:
5          Q.       What's the difference to your
6 understanding of what a cost reimburse contract is
7 versus a performance based contract?
8          A.       Well, cost reimbursement is, you
9 know, you bill for expenses and they are compensated
10 for.  And performance based requires that there be
11 certain outcomes in order to be reimbursed
12 regardless of the cost.
13          Q.       So, as of the date of this e-mail,
14 were you aware that from July 1, 2005 going forward,
15 at least part of the contract would be performance
16 based as opposed to cost reimbursement?
17               MR. WALKER:  Objection to the form.
18               THE WITNESS:  Candidly, I don't
19 recall it.
20 BY MS. ABRAMS:
21          Q.       Okay.  At the time that the contract
22 was entered into for the EARN Center, what was your
23 understanding as to what types of performance -- was
24 it your understanding that there were performance

— EAST COAST LEGAL SUPPORT, LLC —

---

— BELL —

34

1 benchmarks that needed to be accomplished as part of
2 the contract?
3          A.       That there would be?  Yes.
4          Q.       Okay.  Were you ever informed as to
5 what those performance benchmarks were?
6          A.       No.  I'm not a workforce development
7 expert.  I would not have gotten into that logo of
8 detail.
9          Q.       Did you have any involvement into
10 either tracking whether or not benchmarks, which
11 were part of the contract, were met?
12          A.       No.
13          Q.       And who would have been responsible
14 for tracking the performance against the benchmarks
15 on behalf of CPA?
16               MR. WALKER:  Objection to the form.
17               THE WITNESS:  Whoever was running
18 the program.  Our portion of the program.
19 BY MS. ABRAMS:
20          Q.       So, that would've been Ms. Terrell
21 and then Ms. Price?
22          A.       Yes.  And, apparently, Mr. Macdonald
23 in between, must have been in on the thing we did.
24          Q.       Okay.  Let me show you what was

— EAST COAST LEGAL SUPPORT, LLC —

---

— BELL —

35

1 previously marked as Terrell-3.
2               Have you ever seen this document
3 before?
4          A.       It's not familiar to me.
5          Q.       Were you made aware of any of the
6 issues that were raised in this document?
7          A.       I was made aware of issues that came
8 to light as a result of an audit.  I don't know if
9 it's reflected in this document or a subsequent
10 document.
11          Q.       Okay.  So, you became aware of --
12 when you say, "audit", are these the audits that the
13 Philadelphia Work Force Development Corporation,
14 PWDC, performed?
15          A.       Yes.
16          Q.       Okay.  We'll get to those.
17               Would you have had any involvement
18 in any corrective actions regarding any of the
19 issues raised in this memorandum?
20          A.       I never saw this memorandum, so
21 likely not.
22          Q.       Okay.  Let me show you what was
23 previously marked as Terrell-5.
24               And you don't have to read it in

— EAST COAST LEGAL SUPPORT, LLC —

---

— BELL —

36

1 detail, just look over it generally.
2               Do you recall receiving a copy of
3 this audit done by PWDC?
4          A.       This or another audit.  I mean, I
5 don't know that this is the audit I received, but I
6 did, at some point, see an audit that was done by
7 PWDC that looks like this.
8          Q.       So, am I correct that you only saw
9 one audit?
10          A.       Yes.
11          Q.       And you don't recall which?
12          A.       I'm sure that whatever audit I saw
13 was a latter audit.
14          Q.       Okay.  Then, am I also correct, that
15 prior to receiving the audit that you actually
16 received, you had no involvement in any corrective
17 actions called for by any of the previous audits?
18          A.       No, not specifically.  That doesn't
19 mean that I didn't discuss the fact with people,
20 like Mr. Macdonald, that there had been an audit
21 done or some looksy at the program done and that
22 some things needed to -- there was a lot, I think,
23 of confusion, more often times, as I understand it,
24 that PWDC was changing their rules as quickly as

— EAST COAST LEGAL SUPPORT, LLC —

37

BELL

1   people could try and keep up with it.  So, it was a
2   problem that everybody was coping with, not just us.
3       Q.      And how did you come to that
4   understanding?
5       A.      By way of conversations.
6       Q.      With whom, if you recall?
7       A.      Probably Mr. Macdonald.  I don't
8   recall specific conversation.
9       Q.      Do you recall any conversations with
10  Mr. Macdonald in or around the beginning of
11  November, 2005 regarding issues that is were raised
12  by PWDC?
13      A.      I will not be able to recall the
14  month and day of a conversation at this point about
15  this kind of material.  It's just too many things
16  going on around here in a day, a month, a week for
17  me to tell you what conversation I had in a month
18  several years ago.
19      Q.      Okay.  Did you have any involvement
20  in preparing any type of corrective action plan for
21  the EARN Center at any time?
22      A.      The only part I had was to review
23  when Price's corrective action plan.  Whenever she
24  prepared that.  And, again, I will not be able to

EAST COAST LEGAL SUPPORT, LLC

38

BELL

1   give you the month and year of that, but she did
2   share that with me.
3               This was the plan that she was
4   proposing.
5       Q.      That Ms. Price proposed?
6       A.      Yes.
7       Q.      Let me show you what was previously
8   marked as Terrell-6, and ask you just to review it
9   to yourself.
10              Have you reviewed the document?
11      A.      Yes.
12      Q.      Is this a corrective action plan
13  that you recall reviewing?
14      A.      I did not review this plan, but I'm
15  looking at this plan, and it's jogging my memory
16  that we had a meeting with Mr. Schnieders, I think
17  Roe was there, Brenda, and Gwen, and I don't know if
18  it was this one or a subsequent one.
19      Q.      And what do you recall of that
20  meeting?
21      A.      It was a meeting to discuss what we
22  were going to do in response to some of the
23  problems, the findings of an audit.
24      Q.      And do you are recall any of the

EAST COAST LEGAL SUPPORT, LLC

39

BELL

1   specifics of those discussions?
2       A.      No.
3       Q.      At some time did you become aware
4   that part of the EARN Center moved out of the West
5   Philadelphia Community Center?
6           MR. WALKER:  Objection to the form.
7           THE WITNESS:  Yes.
8   BY MS. ABRAMS:
9       Q.      And how did you become aware of
10  that?
11      A.      I'm not sure how I first became
12  aware of that, but I did have a conversation with
13  Mr. Schnieders about it.
14      Q.      What do you recall about that
15  conversation?
16      A.      He felt that they needed additional
17  space.  They had been given another county
18  assistance office.  They were still going to use
19  West Philadelphia Community Center, but they were
20  going to divide up the functions between the two
21  sites differently.  And I -- candidly, that's about
22  the gist of the conversation.
23              It wasn't relieving.  It was that we
24  needed all this additional space because we're going

EAST COAST LEGAL SUPPORT, LLC

40

BELL

1   to have all these additional clients that we're
2   going to have to serve, and there's not enough space
3   in the Community Center to do all of this and still
4   do X, Y, and Z at the Community Center, whatever
5   that might be.
6       Q.      Do you recall, approximately, when
7   that conversation took place?
8       A.      No, I don't.
9       Q.      Did you become aware, at sometime,
10  that the EARN Center completely left the West
11  Philadelphia Community Center?
12          MR. WALKER:  Objection to the form.
13          THE WITNESS:  They never said that
14  they completely left.  They left things there.  They
15  kept saying they were going to have job fairs, and
16  they were going to perform some other functions of
17  their operation there.  And that was towards the end
18  of the fiscal year.  And then they just stopped
19  doing it.
20              But, no, I mean, I was not told, and
21  I was not under the understanding that they just
22  moved out and would no longer conduct any business
23  in that building.
24  BY MS. ABRAMS:

EAST COAST LEGAL SUPPORT, LLC

41

—BELL—

1          Q.     Okay.  Do you recall attending a
2    meeting in January of 2006 regarding changes in the
3    budget made by PWDC?
4               MR. WALKER:  Objection to form.
5               THE WITNESS:  January?  No.
6               MS. ABRAMS:  Let me mark this as
7    Bell-3, please.
8               (Whereupon, a document was marked
9    for identification as Exhibit Bell-3.)
10   BY MS. ABRAMS:
11         Q.     Is this your handwriting?
12         A.     No.
13         Q.     Do you know whose handwriting it is?
14         A.     No.
15         Q.     Okay.  Do you recall attending a
16   meeting with Jerry, where the PWDC budget changes
17   were discussed?
18         A.     No.  Not in January, no.
19         Q.     Do you recall attending a meeting of
20   that nature at all?
21         A.     Yes.
22         Q.     Let me show you what was previously
23   marked as Houston-13.
24               Have you ever seen this document

—EAST COAST LEGAL SUPPORT, LLC—

42

—BELL—

1    before?
2          A.     I'm not sure.  This looks like a
3    photo document that was given out at a meeting in
4    April.
5          Q.     It may have been April?
6          A.     It looks like it, but I don't know
7    if the numbers are the same as what I was handed out
8    in that meeting.  I don't know.
9          Q.     Okay.  At that meeting that you
10   recall being in April, do you recall specific
11   discussion regarding what percentage of the contract
12   would be cost reimbursement, and what percentage
13   would be performance based?
14         A.     Yes.
15         Q.     And does this document, which says
16   70 percent cost reimbursed, is that the percentage
17   that you recall being discussed at the meeting?
18         A.     Yes.
19         Q.     Was there any discussion at that
20   meeting as to what benchmarks would have to be met
21   to earn the 30 percent performance base?
22         A.     There was another page.  If this is
23   what was handed out, there was another page that
24   listed those items.  And it's not in front of me.  I

—EAST COAST LEGAL SUPPORT, LLC—

43

—BELL—

1    don't recall what they were.
2          Q.     Okay.  Did you have any involvement
3    in making sure that benchmarks were met at the EARN
4    Center?
5          A.     My involvement in making sure
6    benchmarks were met were just general oversights, so
7    that, as I've said to you, when I felt that problems
8    were not being resolved, and I had given them enough
9    time to get resolved with other people that I made
10   changes in attempt to resolve them.
11               I don't think that anyone thought we
12   could go back and fix what was already done earlier.
13         Q.     And those changes were when you put
14   Ms. Price in charge of the program?
15         A.     Yes.
16         Q.     And are there any other changes that
17   you recall making?
18         A.     I wouldn't say I made changes.  I
19   would just say, you know, when I had conversations
20   with Mr. Macdonald, specifically, if there were
21   problems, I tried to help him find ways to solve
22   those problems and move things along.
23         Q.     Was Mr. Macdonald the person who,
24   at, kind of, an oversight level, was responsible for

—EAST COAST LEGAL SUPPORT, LLC—

44

—BELL—

1    making sure that what needed to be done at the EARN
2    Center was done?
3          A.     Yes.
4          Q.     Okay.  Let me show you what was
5    previously marked as Macdonald-4.
6               Do you recall seeing this document
7    before?
8          A.     I don't recall it, but I probably
9    did.
10         Q.     Okay.  Do you recall having any
11   discussions with anyone in your staff regarding the
12   results of this audit?
13         A.     This is actually -- has a corrective
14   action plan attached to it.  Part of it is really --
15   I mean, there are elements on this document that are
16   the corrective action plan that EDSI submitted.
17               It would've been, in a sense, after
18   the fact.
19         Q.     Okay.  The date on this cover letter
20   of the audit is March 3, 2006.  Do you recall having
21   any conversations after that date, regarding any
22   remaining efficiencies that are noted in this audit?
23         A.     No, I don't.  But, again, my
24   conversations would've been ongoing and calculated

—EAST COAST LEGAL SUPPORT, LLC—

45

—— BELL ——

1   to make sure that we were trying, for our part, to
2   address what was going wrong.  With the
3   understanding that what was going wrong, wasn't
4   necessary all our part.
5        Q.    Okay.  When you say, "with what was
6   going on wasn't necessary all your part", can you
7   explain that a little bit further about who else?
8        A.    If there were other people who was
9   part of this program, EDSI was running this program.
10  They had things that they were supposed to do as
11  well.
12             There were conversations about who
13  was -- why were there boxes of things that were
14  never put into the system, documents that were not
15  properly entered into the database.
16             There were some disputes about who
17  was responsible for what.  As well as I understood
18  it, some confusion along the way, based on the
19  changing requirements of the funder was applying to
20  the program.
21       Q.    And who do you recall having these
22  conversations with?
23       A.    I don't recall who I had those
24  conversations with.

—— EAST COAST LEGAL SUPPORT, LLC ——

46

—— BELL ——

1        Q.    And do you recall any specifics of
2   those conversations other than what you already
3   said?
4        A.    No, I don't.
5        Q.    Let me show you what was
6   previously marked as Macdonald-5.
7             Do you recall seeing this audit?
8        A.    No, I don't.  It doesn't mean I
9   didn't see it.  I just don't recall it.
10       Q.    Okay.  Do -- am I correct that May
11  4th, 2006 was almost at the end of that current
12  fiscal year?
13            MR. WALKER:  Objection to the form.
14            THE WITNESS:  Yes.
15  BY MS. ABRAMS:
16       Q.    And what is your understanding of
17  when CPA's obligations under the contract ended?
18       A.    June 30th, 2006.
19       Q.    Do you recall having any discussions
20  with anyone about the shortfalls that are noted in
21  the audit dated May 4th, 2006?
22       A.    My answer would be the same as it
23  was for any of these.  You know, Ms. Price was
24  really an expert in working with PWDC and the kinds

—— EAST COAST LEGAL SUPPORT, LLC ——

47

—— BELL ——

1   of standards that they have.  I thought that I could
2   rely on her to address these kinds of concerns.
3        Q.    Okay.
4        A.    She was, by then, cited at the other
5   location.
6        Q.    She was not at the West Philadelphia
7   Community Center?
8        A.    No, she wasn't.
9        Q.    Do you recall when she and her staff
10  moved from the West Philadelphia Community Center?
11       A.    Some time that spring.
12       Q.    Okay.  Did you have any oversight as
13  to who at the West Philadelphia Community Center was
14  actually doing work on the EARN Center project?
15            MR. WALKER:  Objection to the form.
16            THE WITNESS:  Did I have any
17  oversight?
18  BY MS. ABRAMS:
19       Q.    Yes.  Did you have any -- did you
20  review, for instance, any of the invoices to see
21  that the people who were invoiced were actually
22  working on the --
23       A.    I don't review invoices.  I have
24  nothing to do with invoicing.

—— EAST COAST LEGAL SUPPORT, LLC ——

48

—— BELL ——

1        Q.    Okay.  Did you become aware at some
2   point, as to what portion of the performance based
3   part of the contract was actually paid by PWDC?
4        A.    No, I didn't.
5        Q.    Okay.  When is the first time that
6   you became aware of the final payment made by EDSI
7   to CPA in October of 2006?
8             MR. WALKER:  Objection to the form.
9             THE WITNESS:  If it was made in
10  October, which I can not testify to, but I know it
11  was a while after the end of the fiscal year,
12  probably upon its arrival, or shortly there after.
13  BY MS. ABRAMS:
14       Q.    Did you have any discussions with
15  anyone at CPA, other than counsel, regarding the
16  payment that was made, that last payment that CPA
17  actually received?
18       A.    Yes.
19       Q.    And who did you have discussions
20  with?
21       A.    With my fiscal department.
22       Q.    Who, specifically, if you recall?
23       A.    With Mr. Hastings, specifically, and
24  probably my CFO.

—— EAST COAST LEGAL SUPPORT, LLC ——

49

— BELL —

1       Q.     Who is your CFO?

2       A.     Mr. Christy.

3       Q.     Did you have one conversation or

4 more than one conversation?

5       A.     I'm sure it was more than one.

6       Q.     Do you recall any specific

7 conversations, or do you just have a general

8 recollection of what was discussed?

9       A.     There certainly were discussions

10 about the fact that that check was marked

11 performance based, as though it was from the

12 performance based portion of the contract, and,

13 therefore, was not any of the cost reimbursement

14 portion.  And secondarily, I said, "Do not deposit

15 the check.  If we deposit it, we may be foregoing

16 our right to take action.  I want to seek legal

17 counsel about that."

18      Q.     What else do you recall about those

19 discussions?

20      A.     Nothing much.  Shocking.

21      Q.     Okay.  When that check was received,

22 was there a revised budget that was also submitted

23 to your recollection?

24      MR. WALKER:  Objection to the form.

— EAST COAST LEGAL SUPPORT, LLC —

---

50

— BELL —

1       THE WITNESS:  I don't know what you

2 mean by that.

3 BY MS. ABRAMS:

4      Q.     Did EDSI provide any explanation of

5 how they arrived at the number, the amount of the

6 check?

7      A.     No, not that I saw.  No.

8      Q.     Aside from any conversations with

9 counsel, do you recall any other communications that

10 you had regarding performance issues with the EARN

11 Center contract, other than what we've already

12 discussed?

13      A.     Not specifically, no.

14      Q.     Other than what we've already

15 discussed, and any conversation with counsel, where

16 counsel was present, do you have -- did you have any

17 other communication regarding the invoices submitted

18 to EDSI?

19      A.     For the latter part of the contract.

20 I would, periodically, have a conversation with Mr.

21 Hastings about whether we had been paid.  He was

22 telling me he was speaking with a controller out in

23 Michigan, and that they had just not been paid by

24 PWDC, but as soon as they were paid by PWDC, we'd be

— EAST COAST LEGAL SUPPORT, LLC —

---

51

— BELL —

1 paid.

2       And somewhere along the line, of

3 course, I called Mr. Schnieders and said, you know,

4 "Your controller has stopped calling our people

5 back."

6       And he said, "I'll take care of

7 that.  I can't understand that."

8       So, you know, the conversations that

9 I had, never indicated to me that there was no

10 payment for the cost reimbursement portion

11 forthcoming.

12      Q.     Aside from what we've already talked

13 about, and any conversations you had with counsel or

14 where counsel was present, do you recall any other

15 conversations regarding the final check that you

16 received from EDSI?

17      A.     I'm sure I told Mr. Macdonald, for

18 example, that they're not paying us for any of our

19 expenses for the last six months, and we got a check

20 that says "performance based payment."

21       We were lead to believe that we

22 would be paid.

23      Q.     And tell me how you were lead to

24 believe that you would be paid?

— EAST COAST LEGAL SUPPORT, LLC —

---

52

— BELL —

1      A.     Well, when we had the meeting with

2 the revised budget, we were given numbers, and I sat

3 with my fiscal people, because I'm not a fiscal

4 person, and said, "Can we make it through the rest

5 of the year with this money?"

6       And based on the numbers that we

7 were given, we concluded that we would be able to

8 break even based on what was put in front of us that

9 day in April, I believe it was.

10     MS. ABRAMS:  Can we take a five

11 minute break?

12     MR. WALKER:  Sure.

13 BY MS. ABRAMS:

14      Q.     Was the EARN Center contract your

15 first contract with PWDC?

16      A.     No.

17      Q.     Did you have an understanding, prior

18 to entering into the EARN Center contract, what that

19 invoice requirements were of PWDC?

20      A.     I don't do the invoicing, so, no.

21      Q.     So, you had no understanding about

22 the timeframes in which invoices were required to be

23 submitted?

24      A.     I'm not involved in invoicing.

— EAST COAST LEGAL SUPPORT, LLC —

53

— BELL —

1    Q.    At all?

2    A.    No.

3    Q.    Were you familiar prior to entering

4    into the EARN Center contract about the difference

5    between a cost reimbursement and a performance based

6    portion of a contract with PWDC?

7    A.    Yes.

8    Q.    And can you explain for me what your

9    understanding was of the requirements for being paid

10   for the performance based portions of a PWDC

11   contract?

12        MR. WALKER:  Objection to the form.

13        THE WITNESS:  I — since I didn't

14   document for invoices, I can't give you specifics.

15   I mean, our experience was the Pregnant and

16   Parenting Youth Program.  My understanding is that

17   there were records kept, that reflected

18   whatever the outcomes that PWDC required for the

19   contract, and they would look at those documents and

20   determine your performance.

21   BY MS. ABRAMS:

22        Q.    And was it your understanding that

23   the amount that would be paid on the performance

24   based contract would be based on the documentation

— EAST COAST LEGAL SUPPORT, LLC —

54

— BELL —

1    of reaching those specific benchmarks?

2        MR. WALKER:  Objection to the form.

3    Which contract are we talking about?

4        MS. ABRAMS:  She mentioned the

5    pregnancy and —

6        THE WITNESS:  Pregnant and Parenting

7    Youth.

8    BY MS. ABRAMS:

9        Q.    Let's take that for an example.  Was

10   it your understanding that the payment for the

11   performance based portion of that contract was

12   dependant upon your organization fulfilling specific

13   benchmarks set forth by PWDC?

14       A.    You know, I'm not even sure that

15   that contract had a performance based component.

16   However, it did have performance goals by which your

17   contract performance was judged.

18       I don't believe that that

19   necessarily meant anything to your payments.

20   However, it meant something to the future of you

21   having the contract.

22       Q.    Okay.  In your experience, when

23   there was a performance based portion to a contract,

24   was it your understanding that certain benchmarks

— EAST COAST LEGAL SUPPORT, LLC —

55

— BELL —

1    that the payment was dependant upon your performance

2    as compared to certain benchmarks set my PWDC?

3        A.    Yes.

4        Q.    Okay.  Aside from what we already

5    discussed, and any conversations or communications

6    where counsel was involved, or with counsel, do you

7    recall any other communication regarding this

8    lawsuit?

9        MR. WALKER:  Objection to the form.

10        THE WITNESS:  In a general sense,

11   I'm sure I had some conversation with Mr. Macdonald

12   about it, with Ms. Price about it, with my board of

13   directors making them aware of it.

14   BY MS. ABRAMS:

15       Q.    Do you recall any specifics of any

16   of those conversations?

17       A.    No.  I mean, for the board of

18   directors, we would just simply be making a factual

19   presentation of where things stand, and what action

20   we've taken, and give them progress reports.

21       With a staff member of the

22   management team, it would just be general

23   conversation.

24       Q.    Aside from what we've already spoken

— EAST COAST LEGAL SUPPORT, LLC —

56

— BELL —

1    about, or any conversations with counsel, or where

2    counsel was present, do you recall any other

3    communication regarding CPA's contract with EDSI?

4        MR. WALKER:  Objection to the form.

5        THE WITNESS:  I probably have had a

6    conversation with Debbie Coleman of PWDC, because I

7    had to call her to let her know that they were going

8    to be asked, you know, for some Discovery.  And then

9    I would have told her why they would be asking for

10   Discovery.

11   BY MS. ABRAMS:

12       Q.    Do you recall any of the specifics

13   of that conversation with Ms. Coleman?

14       A.    Not really.  No.

15       Q.    Okay.

16       I'm finished.  I don't know if Mr.

17   Walker has any questions.

18        MR. WALKER:  No questions.

19        MS. ABRAMS:  Thank you very much for

20   your time.

21        THE WITNESS:  Thank you.

22        (Witness excused.)

23        (Whereupon, the deposition concluded

24   at 11:26 a.m.)

— EAST COAST LEGAL SUPPORT, LLC —

57

BELL

1
2          I have read the foregoing transcript
3  of my examination given on February 14th, 2008, and
4  it is true, correct, and complete, to the best of my
5  knowledge, recollection, and belief, except for the
6  list of corrections, if any, attached on a separate
7  sheet herewith.
8
9
10
11  _____        _____
12
13  Date                      Arlene Bell, Esquire
14
15
16
17
18
19
20
21
22
23
24

EAST COAST LEGAL SUPPORT, LLC

---

58

1   COMMONWEALTH OF PENNSYLVANIA  :
2
3   COUNTY OF PHILADELPHIA        :
4           I, Janice Philomena Vanore, a
    Professional Shorthand Reporter and a Notary Public
5   in and for the Commonwealth of Pennsylvania, do
    hereby certify that the witness was by me first duly
6   sworn to testify the truth, the whole truth, and
    nothing but the truth; that the foregoing
7   examination was taken at the time and place stated
    hereinbefore; and that the said examination was
8   recorded stenographically by me and then reduced to
    typewriting under my direction, and constitutes a
9   true record of the testimony given by said witness.
10          I further certify that I am not a
    relative, employee or attorney of any of the
11  parties, or a relative or employee of either
    counsel, and that I am in no way interested directly
12  or indirectly in this action.
13
14
15  _____
16  Janice Philomena Vanore
    Professional Shorthand Reporter
17  Notary Public
18
19          (The foregoing certification of this
    transcript does not apply to any reproduction of the
20  same by any means, unless under the direct control
    and/or supervision of the certifying reporter.)
21
22
23
24