IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARING PEOPLE ALLIANCE          :          CIVIL ACTION
                                :
          v.                    :
                                :
EDUCATIONAL DATA SYSTEMS, INC.:           NO. 07-1267

MEMORANDUM

Dalzell, J.                                September 29, 2008

Caring People Alliance ("CPA") is a non-profit organization that provides community-based services in the City of Philadelphia.  Am. Compl. ¶ 5.  Educational Data Systems, Inc. ("EDSI") is a for-profit company that contracts with government agencies and private employers to provide workforce development services, e.g., job training.  Counterclaim ¶ 3.

CPA and EDSI entered into a contract to use funding from the Philadelphia Workforce Development Corporation[1] ("PWDC") to provide workforce development services to welfare recipients in Philadelphia.  Am. Compl., Ex. A.  CPA has sued EDSI for breach of that contract, unjust enrichment, promissory estoppel, and fraud.  EDSI has counterclaimed for breach of contract, breach of implied covenant of good faith and fair dealing, and fraud.

---

[1]PWDC is a quasi-governmental non-profit corporation that the City of Philadelphia uses to administer its workforce development initiatives.

EDSI has moved for summary judgment, and we resolve that motion now.

## I.  Factual Background

### A.  The Story

Prior to entering into the contract that is at the center of this dispute, CPA and EDSI had worked together informally.  Def.'s Mem., Ex. S [Kandel Dep.] at 15-16.  In 2004, CPA and EDSI began to put together a proposal to secure funds from PWDC to run Employment, Advancement, Retention Network ("EARN") Centers that would provide employment counselling and placement services to Philadelphia welfare recipients.  Kandel Dep. at 17-18; Def.'s Mem. Ex. NN [McDonald Dep.] at 20-21; Pl.'s Mem. Ex. E [Bell Dep.] at 16.  The plan was for EDSI to be the single point of contact for PWDC funding for the EARN Centers, and then partner with CPA and other Philadelphia non-profit organizations who would hire staff to provide direct services at the Centers.  McDonald Dep. at 22; Am. Compl. Ex. A; Counterclaim Ex. A.  In of July 2004, PWDC entered into such a contract with EDSI.[2] Counterclaim Ex. A.

---

[2]We discuss this contract at greater length below in Section I(A)(1) of this Memorandum.

EDSI and CPA then promptly began negotiations to formalize their relationship.  MacDonald Dep. at 20-22, 29.  CPA and EDSI hoped to execute two contracts: one related to the use and lease of space at CPA's West Philadelphia Community Center for an EARN Center, and another related to the services CPA would deliver to welfare recipients through that Center, e.g., number of active case managers provided.[3]  MacDonald Dep. at 22; Def.'s Mem. Ex. R [Schnieders Dep.] at 21-22, 25-26.  We note that although the EDSI-CPA contract covers the period from January 1, 2005 until June 30, 2006, the parties did not fully execute the agreement until September 6, 2005.  Am. Compl. Ex. A.  Although the parties seemed to settle on most things relatively early on, they were still negotiating the so-called shared space agreement well into August.  Def.'s Mem. Ex. U.

After PWDC and EDSI did walk-throughs of the Community Center, they determined that various improvements were necessary, including painting, carpeting, furniture, workstations, dividers, and computers.  MacDonald Dep. at 28, 37-39; Schnieders Dep. at 41-45.  PWDC, CPA, and EDSI agreed that these improvements would be part of the set-up costs for the EARN Center in CPA's

---

[3]We discuss this contract's provisions in greater depth below in Section I(A)(2) of this Memorandum.

Community Center that PWDC funding would cover.  MacDonald Dep. at 39-40; Schnieders Dep. at 44-46; Pressey Dep. at 22-23. Renovations began in January of 2005, and cost a total of $156,860.11.  Bell Dep. at 23.  The plan was to have the improvements completed and the EARN Center running at full capacity by March 1, 2005.  Schnieders Dep. at 18-19.

Unfortunately, things did not go as planned.  By March 1, 2005, CPA had not hired a full complement of case managers as the contract required.  MacDonald Dep. at 32-34; Def.'s Mem. Ex. B [Falcone Aff.] ¶¶ 12, 13.  In April of 2005, the Center began operating at partial capacity.  MacDonald Dep. at 32; Falcone Aff. ¶ 12; Def.'s Mem. Ex. E [Terrell Dep.] at 30.  It was not operating with a full staff until the summer of that year. Falcone Aff. ¶ 13.  Towards the end of the contract, the total number of CPA's EARN Center staff began to dwindle once again. MacDonald Dep. at 47-48; Bell Dep. at 30-31.

Problems quickly arose between the EDSI staff and the CPA staff.  The latter was responsible for the case management services, while the former provided program management and other services, e.g., readiness training and job development support. Schnieders Dep. at 21-26; MacDonald Dep. at 22; see Falcone Aff. ¶¶ 3, 9; Terrell Dep. at 37.  The CPA case managers complained

4

about not knowing whether EDSI or CPA personnel were in charge. MacDonald Dep. at 51-53; Bell Dep. at 29; Terrell Dep. at 36. EDSI was also unhappy with the initial performance of the case managers, and instituted 8:00 a.m. meetings to address some of these issues.  Def.'s Mem. Ex F; Falcone Aff. ¶¶ 15, 16, 19-21; Bell Dep. at 29; MacDonald Dep. at 53-54; Terrell Dep. at 37-38. These meetings were unpopular with the case managers and their supervisors; they complained that their job often required them to work off-hours, and the 8:00 a.m. meetings were onerous. MacDonald Dep. at 53-54; Terrell Dep. at 38-39.

The personnel problems eventually caught the attention of the highest principals at EDSI and CPA.  Def.'s Mem. Ex. H, Ex. F; Bell Dep. at 29-31.  EDSI's head representative at the EARN Center, Roe Falcone, sought help with these personnel problems from CPA's Vice-President of Business Development and Planning, Gerald MacDonald.  Def.'s Mem. Ex. F.  MacDonald sent an email to Falcone in which he reiterated the concerns CPA's EARN Center manager, Brenda Terrell, had brought to his attention, and clarified that there were two chains of command, one for EDSI employees and another for CPA employees, but that cooperation between the two was essential to success.  Id.  The email was forwarded to EDSI's then-CEO Robert Schnieders.  Id.

Schnieders was dismayed about the two different chains of command and thought it a bad idea, but stated "[i]f that practice works, we can live with it.  If it doesn't work, [CPA's EARN Center's staff's] full participation will become mandatory."  Id. Eventually, the 8:00 a.m. meetings did become mandatory, though not all of the case managers could make every meeting.  Terrell Dep. at 21, 37-38.  Problems between EDSI and CPA staff eventually led to Brenda Terrell leaving her position in the EARN Center in February of 2006.  Terrell Dep. at 59-60; Bell Dep. at 30; MacDonald Dep. at 66-67.

Problems also arose with the use of space in CPA's Community Center.  The Community Center -- described by one former CPA employee as underutilized -- housed a day-care, summer camp, senior and after-school programs, and teen pregnancy programs.  Kandel Dep. at 14; MacDonald Dep. at 23; Bell Dep. at 19.  EDSI complained that the large presence of children during the summer who were enrolled in CPA's summer day-care program took away from the space the EARN center needed.  Terrell Dep. at 32; Bell Dep. at 27-28; MacDonald Dep. at 46.  This prompted CPA to rent space elsewhere for use by participants in that program so EDSI could have more exclusive space available for the EARN Center.  Bell Dep. at 27-28; MacDonald Dep. at 46.  Nonetheless,

EDSI made the decision that it needed more space than was available to them at the Community Center, and as early as August of 2005 leased space in another building.[4]  Falcone Aff. ¶ 36; Def.'s Mem. Ex. T [Pressey Dep.] at 21, 24-25; Schnieders Dep. at 24.  This began a slow process of transferring operations to the other site, but EDSI did not completely transfer its operations to this new space until mid-April.  Falcone Aff. ¶ 37; McDonald Dep. at 69-71.  Some of the property, e.g., furniture and computers bought for the EARN Center stayed at the Community Center, though why precisely this happened is in dispute. Falcone Aff. ¶¶ 38-39; Schnieders Dep. at 61, 70-71; MacDonald Dep. at 42.

In March of 2005, EDSI ran an independent audit of the costs CPA was reporting from January 1, 2005 to March 31, 2005. Def.'s Mem. Ex. G.  In their report, the auditors determined that CPA was not using an accrual method of accounting, there were certain costs not accounted for on CPA's books, and back-up documentation for certain cost allocations was lacking.  Id.

---

[4]We find this particularly puzzling since the shared space agreement EDSI and CPA signed was not executed until September 6, 2005, and seems to contemplate the use of the West Philadelphia Community Center as a fully functioning EARN Center.  See Am. Compl. Ex. A at Ex. B.

On July 28, 2005, Robert Schnieders, EDSI's CEO, sent CPA's Arlene Bell and Gerald MacDonald an email in which Schnieders explained that in the fiscal year beginning on July 1, 2005, PWDC had changed the reimbursement structure.  Def.'s Mem. Ex. H.  PWDC was going to make some portion of reimbursement dependent on meeting certain performance benchmarks.  Id.  It was not until January of 2006 that PWDC revealed the precise split between cost reimbursement and performance payments (70/30), and it was not until April of 2006 that PWDC and EDSI formalized the modification to the contract that specified the benchmarks to be met.  Def. Mem. at KK.

On October 24, 2005, PWDC completed a performance audit of the EDSI-CPA EARN Center.  Def.'s Mem. Ex. L.  In this audit, PWDC found that the overall success rate, based on various metrics, was twenty-eight percent, much below the goal of an eighty-five percent success rate.  Id. at 1.  PWDC noted that the problems uncovered required urgent action.  Id.  These problems included insufficient tracking of clients through the program, required documents missing from the client files, and large numbers of clients not meeting mandated participation requirements.  Id. at 1-3.  The audit also outlined corrective measures to be implemented.  Id. at 2-5.

8

In January of 2006, PWDC and EDSI began discussing potential reductions in funding for EDSI's EARN Centers.  Def.'s Mem. Ex. KK at 3.  PWDC made the decision to change the funding amounts because EDSI had not spent the full amount allocated from January 1, 2005 to June 30, 2006.  Id. at 4.  PWDC had initially allocated $1,580,640 for this period but only disbursed $524,879.28.  Id. at 4-11.  EDSI pointed out there were some costs that ought to have been reimbursed from the amount allocated for fiscal year 2004-2005, but which could not be because CPA had submitted its invoices too late to be included.  Id. at 3.[5]  PWDC eventually modified the contract by reducing the funding for fiscal year 2004-2005 to what was actually funded, and increased the overall funding for fiscal year 2005-2006 to $3,569,0420.  Id. at 4.  This change reduced EDSI's overall funding from $4,741,914 to $4,093,921. PWDC also modified the contract with EDSI to make thirty percent of reimbursement contingent on performance, and established new benchmarks for assessing performance.  Id.

On March 3, 2006, PWDC completed its second performance

_____

[5]CPA had almost immediate problems with prompt invoicing of its costs.  We shall discuss the provisions of the contract relating to invoicing procedures and CPA's invoicing practices below at Section I (B) and (C) of this opinion.

audit of the EDSI-CPA EARN Center.  Def.'s Mem. Ex. O.  This
audit covered the period through January of 2006.  The EDSI-CPA
EARN Center performed better than in the previous audit, with a
forty-nine percent success rate, but PWDC pointed out continuing
problems with client attendance and missing documents from client
files.  Id. at 2.  According to PWDC, the EARN Center's overall
improved success rate meant that the corrective action plan that
PWDC had put into place after the October audit was working, and
PWDC reiterated that the EARN Center should continue to implement
that plan.  Id. at 3.

On April 3, 2006, EDSI met with all its subcontractors,
including CPA, and informed them of PWDC's decision to reduce
EDSI's overall funding.  Schnieders Dep. at 79; Bell Dep. at 42.
During that meeting, EDSI provided budget figures to the
subcontractors.  Pl.'s Mem. Ex. A at 1-2.  The budget stated that
CPA's reduced budget for July of 2005 until June of 2006 would
total $1,309,489.96, with $916,684.11 (seventy percent) as cost
reimbursement and $392,805.85 (thirty percent) as performance-
based payments.  Id.  Later, EDSI's Comptroller Mark W. Pressey
acknowledged that the numbers presented at this meeting to the
subcontractors were "on the high side."  Pl.'s Mem. Ex. D;
Pressey Dep. at 39-41.

On May 4, 2006, PWDC completed its third performance audit of the EDSI-CPA EARN Center. Def.'s Mem. Ex. P. This audit covered the period through April of 2006. Id. This time PWDC found the EDSI-CPA EARN Center had a fifty percent success rate, a one percent increase from the last audit. Id. PWDC had hoped to see a ten percent overall increase from the last. Id. at 2. PWDC noted that client attendance numbers had increased significantly, but also noted continued problems with the documentation in the client files and a case manager to client ratio that exceeded the permitted maximum. Id. at 3. PWDC also instituted new measures to the corrective action plan to increase monitoring and client participation. Id. at 3-5. PWDC stated in the audit that if the EDSI-CPA EARN Center did not see a ten percent increase in the success rate by July of 2006 the EARN Center could be put on "probationary status". Id. at 1.

On June 6, 2006, Schnieders sent Bell a letter in which he requested that CPA submit its "final invoice no late [sic] than July 20, 2006 [because] [t]he fiscal year ends June 30th and this will ensure that everything is in order to close out the grant." Pl.'s Mem. Ex. B. Consistent with this request, CPA submitted its final invoice, which consisted of the last three months' worth of costs CPA had incurred through the EARN program.

Joint Stipulation as to Certain Facts ¶ 2, 4-12.

After the contract period was over, it took EDSI a long time to get CPA their final reimbursements.  Apparently, communications between the EDSI and CPA financial people broke down.  Bell Dep. at 50-51.  EDSI repeatedly reassured CPA that EDSI would pay CPA once PWDC paid EDSI.  Bell Dep. 51; MacDonald Dep. at 78.  PWDC began reviewing the progress both in performance and back-up documentation.  Def.'s Mem. Ex. MM.  PWDC disallowed various payments for lack of required documentation. Id.  PWDC also determined that EDSI was only entitled to about fifty percent of the performance-based payments initially allocated for EDSI's EARN Centers.  Def.'s Mem. Ex. LL.

EDSI sent the final reimbursement to CPA on October 24, 2006.  Id.  The final check was for $139,393.13, well below what CPA had expected.  Id; MacDonald Dep. at 79.  In the letter, EDSI explained that the overall budget PWDC had allocated for fiscal year 2005-2006 was $826,209.  Id.  Of this amount, only $15,222.80 out of $578,346.30 remained for cost reimbursement. Id.  Worse still, PWDC had only awarded $124,175.33 out of a possible $247,862.70 for performance-based payments.  Id.  EDSI stated that in total it had suffered a $1,063,519.84 shortfall in its funding, pain that CPA would have to share.  Id.  CPA

12

contacted EDSI regarding the small amount of their final reimbursement, but EDSI told CPA there was nothing to be done about it.  MacDonald Dep. at 79.  Conversations broke down, and this litigation ensued.

### B.    The Contracts

#### 1.    EDSI-CPA Contract

In July of 2004, EDSI entered into a contract with PWDC to run various EARN Centers in Philadelphia.  The contract covered the period from January 1, 2005 until June 30, 2006. Counterclaim Ex. A.  It limited the maximum compensation for this period to $4,741,914, initially allocating $1,580,640 for January 1, 2005 to June 30, 2005, and, contingent on funding, $3,161,274 to July 1, 2005 to June 30, 2006.  Id.

The PWDC-EDSI contract also provided for specific reimbursement procedures.  EDSI was obliged to submit invoices to PWDC within thirty days of the time period for which EDSI sought reimbursement.  Id. at 13.  If EDSI failed to make timely submissions, then the decision to pay EDSI was wholly within PWDC's discretion; PWDC could opt to pay the full sum, reduce the reimbursement by ten percent of the amount invoiced, or not to pay EDSI at all.  Id.  The contract also required that all

invoices for the fiscal year ending June 30, 2006 had to be submitted to PWDC no later than July 31, 2006.  Id.

PWDC and EDSI formally modified this contract in April of 2006.  Def.'s Mem. Ex. KK at 4-11.  As discussed above, the modification reduced the overall amount of PWDC's funding for EDSI's EARN Centers.  Id.  It reduced 2004-2005 funding from $1,580,640 to $524,879.28.  The modification increased fiscal year 2005-2006 funding from $3,161,274 to $3,569,0420, but adjusted the payment structure from 100% cost reimbursement to seventy percent cost reimbursement and thirty percent performance-based payment.  Id.  The modification also set forth the specific metrics by which PWDC would assess performance.  Id.

### 2.   EDSI-CPA Contract

EDSI then entered into contracts with CPA and other non-profit organizations to provide workforce development services throughout Philadelphia.  Am. Compl. Ex. A.  EDSI's contract with CPA actually consisted of two agreements.  Id.  The first agreement was for services and covered each side's obligations to render services and cover costs incurred through the EARN Centers.  Id.  The second agreement, contained in the overall contract as Exhibit B, was the so-called shared space

14

agreement, which covered EDSI's lease and use of space in CPA's Community Center.  Id. Ex. B.

### i.  Services Agreement

The EDSI-CPA services agreement covered January 1, 2005 until June 30, 2006.  Id. § 2.  It stated that total compensation under the agreement for this period would not exceed $1,680,509. Id.  The agreement specified the job requirements for case managers CPA was to hire, staffing requirements CPA was to fulfill, and the client to counselor ratio CPA was to maintain. Id. § 1, Ex. A.  This contract was finally executed on September 6, 2005.  Id.

The services agreement required that all modifications to the agreement be by written amendment.  Id. § 12.  The agreement further stated that

> failure of either party to enforce strictly
> any of the provisions of this Agreement, or
> to require strict performance by the other
> party of any of the provision hereof...shall
> in no way be construed to be a waiver of such
> provisions...While EDSI may monitor [CPA's]
> performance under the Agreement, [CPA]
> remains solely responsible for its
> performance [and] monitoring of the
> Agreement, shall not constitute a waiver or
> modification of any term or condition.

Id.

15

The services agreement contained provisions regarding reimbursement policies that mirrored those in the PWDC-EDSI contract.  The agreement obliged CPA to submit to EDSI monthly invoices within ten days of the month invoiced.  Id. § 5(a). Again, if the invoices were untimely, EDSI could at its discretion opt to fully reimburse CPA, reduce the face value of the invoice by ten percent, or not reimburse CPA at all.  Id.

The services contract also contained a deobligation provision.  Id. § 4.  This provision gives EDSI:

> [T]he right to unilaterally deobligate, modify or amend [CPA]'s budget in proportion to EDSI's funding level, or if necessary, to suspend or terminate this Agreement or any amendment hereto immediately upon written or electronic notice to [CPA], as may be necessitated by EDSI's funding levels.

Id.  This provision contemplated PWDC reducing EDSI's budget, and permitted EDSI to make a commensurate reduction in CPA's budget. Any such deobligation was only "effective upon notification of [CPA] by EDSI."  Id.

These reimbursement policies and deobligation provisions were the focal point of the litigation at its inception.  See September 28, 2007 Order (docket entry #19). Although the parties have broadened their claims against each other, at first this litigation primarily concerned these

16

provisions in the contract and practices of the parties related
to the invoicing of costs.  The parties sought declaratory
judgment and posed two specific questions: (1) whether PWDC's
reduction in EDSI's funding relieved EDSI of its obligation to
pay CPA, and (2) whether the contract permitted EDSI to
unilaterally disallow any invoice it received after the tenth day
of the month following the month the invoice covered.  Id. ¶¶
(t), (ee).

We determined that EDSI did not relieve itself of its
duty to pay CPA until it notified CPA of a reduction in funding,
and the question of whether EDSI provided the obligatory notice
could not be determined without further fact development.  Id. ¶¶
(y), (dd).  We also determined that the services agreement
provisions that permitted EDSI to disallow payments on late
invoices was enforceable and its exercise was not subject to any
time restriction.  Id. ¶¶ (rr), (uu).  At the time, however,
factual questions remained as to whether the parties modified the
contract, and we permitted the litigation to progress.

### ii.  Shared Space Agreement

The shared space agreement was an agreement for EDSI to
lease space in CPA's West Philadelphia Community Center for use

as an EARN center.  Am. Compl Ex. A, Ex. B.  This lease also ran

from January 1, 2005 until June 30, 2006.  <u>Id.</u>  CPA would charge

a total of $8,843.70 each month for rent and utilities.  <u>Id.</u> Ex.

B § 2, § 5.  The shared space agreement also contemplated

renovations to the West Philadelphia Community Center.  <u>Id.</u> §§

1A, 7C; McDonald Dep. at 28.

    This agreement also contained specific "Exclusive Use"

provisions.  <u>Id.</u> § 1A.  These provisions specified areas within

the Community Center that CPA would "make available for use by

EDSI, and EDSI agrees to use."  <u>Id.</u>  With respect to certain

areas -- <u>e.g.</u>, the technology lab and teen lounge -- the

agreement also enumerated conditions and caveats for exclusive

use, <u>e.g.</u>, time of day, "subject to...use up to 4 hours per week

during the aforementioned hours for CPA's senior program."  <u>Id.</u>

    Both the services agreement and the shared space

agreement addressed the issue of improvements.  The services

agreement stated that upon termination of any agreement between

the parties through which the parties purchased property for the

Community Center "[CPA] agrees to return to EDSI all property

purchased with funds under [the agreements] except where [CPA]

and EDSI agree that [CPA] may continue to utilize such property

for another activity.  Any such agreement must be in writing and

approved by EDSI."  Am. Compl. Ex. A, § 7c.

Under the shared space agreement, the parties agreed "to leave as many working computer stations in the lab as CPA maintained in the lab prior to EARN Center renovations."  Id. Ex. B § 1A(xi)(d).  Also, the shared space agreement made "all improvements" the sole and exclusive property of CPA "except where the EARN Center contract between EDSI and PWDC requires the return of such property."  Id. Ex. B § 7C.  This same provision also stated that when the EDSI-CPA contract required the return of any property, EDSI would make a "good-faith petition to PWDC on behalf of CPA to retain said property at the [Community Center]."  Id.

### C.   **The Invoices**

From the outset, CPA did not submit timely invoices. In the end, CPA made eight submissions for reimbursement, which contained a total of fourteen invoices[6]:

---

[6]This table appeared before in our September 28, 2007 Order, and since none of the facts used to develop it have changed, we thought it best to reuse it now.  The table is derived from the information provided in the parties' Joint Stipulation as to Certain Facts ¶ 2, 4-12.

| Invoice # | Amount | Period Covered | Date EDSI Received | Date EDSI Paid |
|---|---|---|---|---|
| 1 | $196,307.90 | 1/1/05 to 3/31/05 | 4/15/05 | 2 checks 11/29/05 ($165,420.63) and 2/7/06 ($30,887.27) |
| 2 | $255,991.58 | 4/1/05 to 6/30/05 | 7/26/05 | in dispute |
| 3 | $78,554.89 | 7/1/05 to 7/31/05 | 1/2/06 | 6/23/06 |
| 4 | $97,334.93 | 8/1/05 to 8/31/05 | 1/2/06 | 6/23/06 |
| 5 | $127,594.58 | 9/1/05 to 9/30/05 | 1/2/06 | 6/23/06 |
| 6 | $91,010.12 | 10/1/05 to 10/31/05 | 1/2/06 | 6/23/06 |
| 7 | $89,823.46 | 11/1/05 to 11/30/05 | 1/12/06 | 6/23/06 |
| 8 | $78,805.60 | 12/1/05 to 12/31/05 | 1/12/06 | 6/23/06 |
| 9 | $76,194.66 | 1/1/06 to 1/31/06 | 2/22/06 | in dispute |
| 10 | $69,864.81 | 2/1/06 to 2/28/06 | 3/31/06 | in dispute |
| 11 | $92,872.85 | 3/1/06 to 3/31/06 | 4/10/06 | in dispute |
| 12 | $78,399.85 | 4/1/06 to 4/30/06 | 7/13/06 | in dispute |
| 13 | $66,660.61 | 5/1/06 to 5/31/06 | 7/13/06 | in dispute |
| 14 | $94,845.51 | 6/1/06 to 6/30/06 | 7/13/06 | in dispute |

Seven invoices remain in dispute.  Of these invoices, EDSI never incorporated nos. 9-14 into its submissions to PWDC. Pressey Dep. 44-49.  EDSI incorporated invoice #2 into a submission sent to PWDC on September 21, 2005, which PWDC reimbursed.  Pressey Dep. at 51-53; Def.'s Mem. in Supp. of Decl. Judgment Ex. D.  PWDC later informed EDSI that the amount attributed to CPA was submitted too late to be considered part of the 2004-2005 fiscal year, so PWDC would credit itself $255,991.58 against payments it would make to EDSI in the 2005-2006 fiscal year.  Pressey Dep. 59-62.

Several of the invoices also contained discrepancies. CPA did not include employee time sheets in some of their invoices.  Def.'s Mem. Ex. OO.  According to EDSI, in every invoice except #1 and #4, CPA included costs relating to people who did not work at the EARN Center, no longer worked there when the salary requests were invoiced, or overcharged for the time worked.  See Falcone Aff. ¶¶ 26-27, 47-51; Def.'s Mem. Ex. V, X, Y, Z, AA, BB, CC, DD, EE, FF, GG, HH, II.  CPA's comptroller, William Hastings, admitted that he had improperly invoiced certain costs to EDSI, but that he would never have noticed his error were it not for EDSI's counterclaims in this case, and never intended to include any improper costs.  Def.'s Mem. Ex. W

21

[Hasting Dep.] 66-69.


## II.  Analysis

EDSI has moved for summary judgment on all the claims.[7]

CPA brought claims for breach of contract, unjust enrichment,

---

[7]Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the evidence, and make all reasonable inferences from the evidence, in the light most favorable to the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the non-moving party's evidence over that presented by the moving party.  Liberty Lobby, 477 U.S. at 255.

The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing there is a genuine issue for trial.'" Matsushita, 475 U.S.  at 587 (quoting Fed. R. Civ. P. 56(e)).  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982).  It is not enough to discredit the moving party's evidence, the non-moving party is required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." Liberty Lobby, 477 U.S. at 257 (emphasis in original). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. See Liberty Lobby, 477 U.S. at 249-50.  Also, If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

promissory estoppel, and fraud.  EDSI asserted claims for breach
of contract, breach of the covenant of good faith and fair
dealing, and fraud.  We will first consider each of CPA's claims,
and then move to EDSI's claims.

### A.   CPA's Claims

As noted, CPA asserts claims for breach of contract,
unjust enrichment, promissory estoppel, and fraud.  We consider
each in turn.

### 1.   CPA's Breach of Contract Claim

We have already ruled that the provisions of the EDSI-
CPA contract permit EDSI to disallow any payment for an invoice
that CPA submitted to EDSI after the tenth day of the month
following the activity period invoiced, and there is no time
restriction on the exercise of this right.  Sept. 28, 2007 Order
¶¶ (rr), (uu).  Also, under the agreement, simple failure to
enforce a provision or remind the other party of the provision's
terms does not constitute a waiver of that provision.  Am. Compl.
Ex. A § 12.  Thus, CPA can only establish that EDSI breached the
contract by not paying CPA for the amounts it invoiced, if CPA
can first establish that the parties modified the contract.

CPA argues that the parties modified this contract

through their course of performance.  See Pl.'s Mem. at 7-12.
But the contract only permits written modifications.  Am. Compl.
Ex. A § 12.  CPA does not and cannot offer any evidence of a
written modification of the contract.

But under Pennsylvania law, "[a]n agreement that
prohibits non-written modification may be modified by subsequent
oral agreement if the parties' conduct clearly shows the intent
to waive the requirement that the amendments be made in writing."
Somerset Community Hosp. v. Allan B. Mitchell & Assoc., Inc., 685
A.2d 141, 146 (Pa. Super. 1996); see also C.I.T. Corp. v. Jonnet,
214 A.2d 620, 622 (Pa. 1965).  One such "implied waiver occurs
when words or conduct express an intent not to exercise a known
contractual right and when the person claiming the waiver was
misled and prejudiced by this behavior."  LBL Skysystems (USA),
Inc. v. APG-America, Inc., 2006 WL 2590497, at *16 (E.D. Pa.
Sept. 6, 2006) (quoting In re MK Lombard Group, Ltd., 2005 WL
735993, at *11 (E.D. Pa. Mar. 31, 2005)); Brown v. City of
Pittsburgh, 186 A.2d 399, 401 (Pa. 1962) ("In the absence of an
express agreement a waiver will not be presumed or implied
contrary to the intention of the party whose rights would be
injuriously affected thereby, unless by his conduct the opposite
party has been misled, to his prejudice, into the honest belief

that such waiver was intended or consented to" (internal quotations omitted)).  This type of implied modification should be based on conduct consisting of "acts and declarations of the parties inconsistent with the existence of the original contract."  Weldon & Kelly Co. v. Pavia Co., 46 A.2d 466, 468 (Pa. 1946).  Thus, course of performance between contracting parties can modify a contract between them despite a provision prohibiting non-written modification.  It can do so if one party acts in a manner inconsistent with its rights under the contract by not exercising known contractual rights, thereby misleading the other party into believing that the former has waived those rights, and thus prejudicing the latter party.

All of CPA's evidence on course of performance consists of EDSI's failures to act.  CPA cannot point to any affirmative act of EDSI that establishes that it relinquished its rights under the contract.  EDSI never specifically disallowed any payments for untimeliness.  EDSI paid for the first eight invoices despite CPA's tardiness.  Joint Stipulation as to Certain Facts ¶ 2, 4-12.  EDSI provided no notice that CPA was delinquent on its invoices, nor did it notify CPA that if it did not submit them in a timely manner, then EDSI would penalize CPA. Hastings Dep. 64; Bell Dep. at 25; Pressey Dep. at 17; see also

25

Schnieders Dep. at 32-34.  Also, EDSI admits that the reason it did not forward CPA's final six invoices to EDSI had nothing to do with the timeliness of their submission, but instead PWDC had stated that its remaining funding was slated for performance payments; thus, cost reimbursement invoices no longer mattered. Pressey Dep. at 44-49.

But EDSI did not act in a manner inconsistent with its rights under the contract.  Although EDSI did fail to provide notice of the potential consequences for untimely submission of invoices, nothing in the contract requires EDSI to provide such notice before exercising its rights.  More importantly, the contract gave EDSI three options if CPA failed to submit timely invoices: EDSI could disallow all payment, reduce the payment by ten percent, or pay the full amount.  Am. Compl. Ex. A § 5(a). Over the first half of the contract EDSI consistently chose the third option.  Without an affirmative act or declaration waiving the right to make a particular choice, we cannot imply such a waiver from a course of performance consistent with the four corners of the contract.  Thus, we find that the course of performance under the EDSI-CPA contract did not modify the contract.

We have previously held that there is no time

restriction on the exercise of EDSI's contractual right to disallow payment for late invoices.  September 28, 2007 Order ¶¶ (rr), (uu).  Thus, EDSI was free to exercise its right not to pay EDSI for the late invoices at any time within reason.  This right does not extend to invoice #11 for $92,872.85 because it was timely submitted to EDSI.  However, EDSI more than covered this amount with its final payment of $139,393.13.  Def.'s Mem. Ex. LL.

This payment, oddly enough, is a technical breach of the contract since it does not conform with the contractual options.  That is to say, it is not a full payment, nonpayment, or ten percent reduction in payment.  But it does operate as a windfall for CPA, so even if CPA sought to use this as grounds for a breach, no damages would be due.[8]

CPA also argues that EDSI extended the time left for CPA's final invoice by sending Bell the June 6, 2006 letter that requests the "final invoice" no later than July 20, 2006.  Pl.'s Mem. Ex. B.  EDSI counters that this invoice was not a extension of the time to file the final invoice, but a form letter that

---

[8]Another possible interpretation could be that this payment was meant to constitute reasonable value for CPA's services rendered despite its failure to submit timely invoices.

27

EDSI sent to each of the subcontractors, as a courtesy, to remind them to submit their final invoices so EDSI and PWDC could close its books.  Schnieders Dep. at 104-05.  Furthermore, EDSI argues that even if it was an extension it would only apply to the last month's invoice and not to the entire final invoice that CPA sent EDSI, which consisted of costs for the months of April, May, and June of 2006.  We agree with EDSI on the latter point.  Since EDSI was free to disallow payment on the earlier late invoices, the only invoice that was potentially extended was that part of CPA's invoice consisting of the costs for June only.

But the larger question of whether the June 6, 2006 letter actually extended the deadline for submission or was simply a reminder that invoices ought to be in, requires one to assess the credibility of competing statements and understandings about the letter.  Only a jury can do that.  Therefore, we will grant summary judgment in favor of EDSI as to CPA's contract claim except insofar as it relates to the question of whether the June 6, 2006 letter extended the time available to CPA to submit invoice #14.

### 2.   CPA's Unjust Enrichment

Under Pennsylvania law, for one to recover for unjust

28

enrichment the defendant must have been enriched by plaintiff's efforts, and it would be unjust to permit defendant to retain the benefit without a payment of value for the benefit retained. Schenck v. K.E. David Ltd., 666 A.2d 327, 328 (PA. Super. 1995). When a contract covers the subject matter in dispute between parties to that contract, Pennsylvania courts do not make findings of unjust enrichment.  Mitchell v. Moore, 729 A.2d 1200, 1203 (Pa. Super. 1999).  But courts find unjust enrichment if a party to a contract has conferred a benefit to the other party through part performance, while at the same time breaching the contract through that part performance.  Oak Ridge Constr. Co. v. Tolley, 504 A.2d 1343, 1348 (Pa. Super. 1985) (citing Restatement (Second) of Contracts § 237)).  If there was unjust enrichment, then defendant must compensate plaintiff for the reasonable value of the benefits conferred.  Pulli v. Warren Nat'l Bank, 412 A.2d 464, 465 (Pa. 1979); J.A. & W.A. Hess, Inc. v. Hazle Township, 400 A.2d 1277, 1280 (Pa. 1979).

        Here, a jury could find unjust enrichment, and failure to pay reasonable value for the services CPA rendered.  We have granted summary judgment to EDSI as to most of CPA's breach of contract claim; the only portion that remains involves invoice #14.  A jury could find that EDSI did not extend the deadline for

submitting the final invoice, and therefore did not breach the contract, relieving EDSI of any further obligation to pay CPA.

But CPA did confer a benefit on EDSI: it paid salaries of staff at the EARN Center, for which it expected to be reimbursed.  EDSI argues that it was not enriched by CPA's conduct because EDSI lost money on the deal.  Schnieders Dep. at 96.  But EDSI continued to operate the EARN Center, and CPA continued to pay some of the staff.  If CPA had stopped paying these salaries, EDSI would have had to pay them, and thus would have incurred more cost.  From EDSI's perspective, CPA was a benefit because it permitted EDSI to spread the risk of a funding shortfall to yet another subcontractor.  Thus, EDSI did benefit from CPA's actions.

The only question remaining is whether EDSI's final payment to CPA constituted reasonable value for services rendered.  EDSI paid CPA for a portion of its costs, $139,393.13.  Def.'s Mem. Ex. L.  Schnieders testified that EDSI calculated its last payment by allocating to CPA a proportional share of the money remaining after spreading the funding shortfall equally between all of the subcontractors and itself.  Schnieders Dep. at 88-89.  Whether this amounts to reasonable value is a question of fact for the jury.

### 3.   Promissory Estoppel Claim

Under Pennsylvania law, promissory estoppel is a doctrine used in the alternative to a breach of contract, and applies only when the standard elements of contract formation cannot be established.  <u>Crouse v. Cyclops Indus.</u>, 745 A.2d 606, 610 (Pa. 2000) ("Where there is no enforceable agreement between the parties because the agreement is not supported by consideration, the doctrine of promissory estoppel is invoked to avoid injustice by making enforceable a promise made by one party to the other when the promisee relies on the promise and therefore changes his position to his own detriment").  Thus, a claim of promissory estoppel is not cognizable in the presence of an express contract.  <u>Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.</u>, 246 F. Supp. 2d 394, 407-08 (E.D. Pa. 2002); <u>see</u> <u>also</u> <u>Carlson v. Arnot-Ogden Memorial Hosp.</u>, 918 F.2d 411, 416 (3d Cir. 1990); <u>Synesiou v. Designtomarket, Inc.</u>, 2002 WL 501494, at *4 (E.D. Pa. Apr.3, 2002).

Here, we have an express contract between the parties that covers the specific subject matter and from which liability and damages can derive.  Thus, promissory estoppel relief is unwarranted and we will grant EDSI's motion for summary judgment on this claim.

31

### 4.   CPA's Fraud Claim

CPA has alleged that EDSI committed fraud based on the statements EDSI made during the April 3, 2006 meeting with its subcontractors.  Under Pennsylvania law, the elements of fraud are (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. E.g., Glover v. Severino, 946 A.2d 710, 713 (Pa. Super. 2008).

What exactly occurred during the meeting is in dispute. According to CPA's executive director, Arlene Bell, the subcontractors "were lead to believe that we would be paid." Bell Dep. at 51.  Bell took the figures back to her financial team to determine whether continued operation of the EARN Center made fiscal sense for CPA.  Bell Dep. at 51-52; MacDonald Dep. at 68-69; Hasting Dep. at 74.  Based on the budget EDSI provided, CPA decided to keep the EARN Center running.  Bell Dep. at 52; MacDonald Dep. at 68-69.  EDSI acknowledges that they knew these numbers were incorrect when EDSI gave them to CPA.  Pl.'s Mem. Ex. D; Pressey Dep. at 39-41.  Around this time, CPA also made the decision to finish out the contract, but not seek to have it

renewed.  Bell Dep. at 30-31; MacDonald Dep. at 72-73; Schnieders
Dep. at 126-27.

EDSI's then-CEO Schnieders recalled the events
differently.  He testified that at the April 3, 2008 meeting he
told the subcontractors about all reductions in funding, and that
the funding would be split: seventy percent of the funding for
cost reimbursement and thirty percent performance-based.
Schnieders Dep. at 79-80.

Thus, we have a dispute as to what exactly was said
during the meeting and what effect it was meant to have: a
question of fact remains as to whether EDSI intended to induce
reliance on its budgetary figures it provided to CPA.  Only a
jury can resolve such a question.  Therefore, we will deny EDSI's
motion for summary judgment as it applies to CPA's fraud claim.

**B.   EDSI's claims**

EDSI claims breach of the covenant of good faith and
fair dealing, breach of contract, and fraud.  Under Pennsylvania
law, there is no distinction between a breach of the covenant of
good faith and fair dealing and a breach of contract claim.
Birth Center v. St. Paul Co., Inc., 787 A.2d 376, 385 (Pa. 2001).
Therefore, we shall conflate the two claims.  After analyzing the

33

EDSI's breach of contract claim, we will turn to its fraud claim.

### 1.    EDSI's Breach of Contract Claim

EDSI contends that CPA breached the contract because CPA failed to hire and retain a full complement of case managers, failed to provide the space as required by the shared space agreement, threatened negative press if EDSI took property from the Community Center that was bought for the EARN Center, failed to meet the benchmarks and corrective action plans imposed by PWDC, and failed to support EDSI when EDSI sought to correct case manager performance issues.  CPA disputes each of these bases for breach of contract.  We consider each in turn.

### i.    Providing Case Managers

EDSI claims that CPA breached the contract by delaying the initial hiring of case managers for the EARN Center, and by failing to maintain a full complement of case managers.

We note that EDSI and CPA modified the contract as it pertained to when CPA had to have the case managers available. The terms of the contract run from January 1, 2005 until June 30, 2006.  Am. Compl. Ex. A § 2.  No other dates are specified in the agreement.  This would mean that CPA was responsible for providing the required number of case managers by January 1,

34

2005.  Yet the parties agree that they had planned renovations for the Community Center that were expected to run until March 1, 2005, and the expectation was that staff would be available to operate the Center from that later date.  The question that remains is not whether the contract was modified on this point, but how it was modified.

The record establishes that CPA initially failed to hire a sufficient number of case managers to work at the EARN Center.  MacDonald Dep. at 32-34; Falcone Aff. ¶¶ 12, 13.  But CPA provides testimonial and documentary evidence to establish that the delay was due to an initial reduction in funding that required CPA to bring people in more slowly than anticipated. Def's Mem. Ex. D, Ex. KK at 2; McDonald Dep. at 33-34.  EDSI can point to no evidence that undermines, either directly or by inference, CPA's proffered evidence.  Thus, the initial failure of CPA to hire the required number of case managers cannot be the basis for breach of contract because the evidence establishes that the parties modified the terms of the contract to permit CPA to bring on case managers at a slower rate than the contract contemplated.

EDSI also claims that the failure of CPA to maintain a full complement of case managers in the waning months of the

35

contract constituted a breach of contract.  CPA admits that it had problems maintaining case managers because of high turnover, and that toward the end of the contract they stopped hiring new case managers because CPA would shortly be out of the contract. MacDonald Dep. at 47-48; Bell Dep. at 30-31.  One could infer from Bell's testimony that the decision for CPA to stop hiring case managers and EDSI to do it directly was made by EDSI and CPA together.  If it did, then there would have been further modification of the contract.  However, if CPA did not confer with EDSI regarding its decision to cease hiring case managers, then CPA would be in breach of the services agreement.  Thus, too many questions of material fact remain for us to go further on summary judgment.

### ii.  Providing Space

EDSI claims that CPA breached the contract by failing to provide the space as required under the contract.  The shared space agreement contains very specific provisions regarding the use of the Community Center.  EDSI cannot point to any specific violations of the agreement.

The space issues seemed to have arisen during the summer of 2005, and here we have a dispute about what happened.  CPA

36

contends that there were space issues related to the summer camp program, and so it rented space in another location to house the children so EDSI could have the space for the EARN Center. Terrell Dep. at 32; Bell Dep. at 27-28; MacDonald Dep. at 46. EDSI counters that CPA did not provide it with the required space, so EDSI made the decision to lease additional space at another location to house much of the EARN Center. Falcone Aff. ¶ 36; Pressey Dep at 21, 24-25; Schnieders Dep. at 24.

EDSI and CPA also dispute whether EDSI provided notice that it was leaving or ever fully left the Community Center. EDSI contends that it told CPA that the Community Center was not working out and they were moving out.  Falcone Aff. ¶¶ 36-37; Schnieders Dep. 61-63.  But the people to whom EDSI would have given notice, Arlene Bell or Gerald MacDonald, testified that neither received notice that EDSI was completely transferring its operations to a new space; instead, they recalled EDSI telling them it would continue to use the space in the Community Center for some EARN Center operations.  Bell Dep. at 39-40; MacDonald Dep. at 70-71; Hasting Dep. at 72.

EDSI has not presented evidence of any actual violation of the shared space agreement, but the fact that EDSI leased extra space does permit the inference that the space, as

37

contracted for, was not provided.  Thus, we are left with material questions of fact, which we cannot resolve on this posture.

### iii. Threats of Bad Press

EDSI also contends that CPA breached the covenant of good faith and fair dealing.  In order to violate the covenant of good faith and fair dealing, a contracting party must act in bad faith with respect to his obligations under the contract.  <u>Birth Center</u>, 787 A.2d at 385; Restatement (Second) Contracts § 205(d) (behaviors identified by the Restatement as bad faith: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance").

EDSI contends that CPA breached this covenant by preventing EDSI from removing the EARN Center's moveable property from the Community Center with threats of bad press.  EDSI employees testified that CPA prevented EDSI from taking the furniture and computers which had been bought to improve the Community Center by threatening EDSI with bad press.  Falcone Aff. ¶¶ 38-39; Schnieders Dep. at 61, 70-71.  CPA denies these

38

allegations, and stated that no one ever prevented EDSI from taking their moveable improvements to the space, but that EDSI voluntarily left much of the furniture because it did not match well with the new space.  MacDonald Dep. at 42.

Again, we are presented with diametrically opposed versions of the same events which bear directly on whether CPA breached the contract.  Therefore, we cannot resolve this question, and must leave it for a jury to decide.

### iv.  Case Manager Performance

EDSI also contends that CPA breached the covenant of good faith and fair dealing, _i.e._, acted in bad faith, based on the case managers' performance, _i.e._, their failure to meet the requisite benchmarks, comply with PWDC's corrective action plan, tardiness, and absenteeism.  EDSI points to these facts as evidence of a willful disregard on the part of the case managers to their duties.

EDSI offers the PWDC audits as proof of this disregard. PWDC initially gave the EARN Center an abysmal overall success rate, and instituted a corrective action plan to remedy the problems.  Def.'s Mem. Ex. L. (twenty-eight percent success rate).  There was much improvement after the second PWDC audit.

39

Def.'s Mem. Ex. O. (forty-nine percent success rate).  But that improvement tapered off quickly.  Def.'s Mem. Ex. P. (one percent increase in success rate).  All of the audits reported continuing problems with client participation and record-keeping.

EDSI also points to the initial personnel problems as evidence of the case managers' and CPA's bad faith.  EDSI contends that the case managers' and Brenda Terrell's absenteeism and failure to attend the 8:00 a.m. meetings constituted bad faith performance of the case managers' and CPA's duties under the contract.  Def.'s Mem. at 42-43.

CPA cannot and does not deny that the audits were bad. CPA does deny the claim that their case managers and supervisors were not trying to meet their responsibilities.  CPA's Arlene Bell, Gerald MacDonald, and Brenda Terrell all testified that they took the corrective action plan seriously and case managers were working to meet these benchmarks.  Bell Dep. at 43-45; MacDonald Dep. at 54-58; Terrell Dep. at 48, 52-54, 67-68. MacDonald also pointed out that some of the larger county assistance was feeding CPA's EARN Center clients, which meant that the number of clients and the space that CPA and EDSI contemplated was markedly low.  MacDonald Dep. at 34-35.  He also testified that case managers worked outside of regular business

hours so they could accommodate their clients' schedules.
MacDonald Dep. at 53-54.  CPA's Terrell testified that the
initial problems with attendance at 8:00 a.m. staff meetings
conducted by EDSI were due to CPA staff having to change their
regularly scheduled hours to make these meetings, and that CPA's
staff was not overly absent.  Terrell Dep. at 34, 36-38.

CPA also disputes that all of the failures were wholly
due to CPA staff.  According to CPA, many of the problems PWDC
cited arose from confusion about whether EDSI or CPA staff was
responsible for a particular task.  Bell Dep. at 45; Terrell Dep.
at 37, 42-43; MacDonald Dep. at 52-53. Also, some of the failures
were due to "changing requirements of the funder."  Bell Dep. at
45.

Questions remain about the quality and adequacy of the
job done, and whose job it was in the first place.  Resolution of
these outstanding questions upon which liability turns requires
determining who is more credible, a job reserved for a jury.
Thus, we will deny EDSI's motion for summary judgment on its
claim for breach of the covenant of good faith and fair dealing
that is based on poor case manager performance.

41

### iv. Materiality Of The Breach

We note that in all of the instances of alleged breach above, another question also remains for the jury, i.e., if after finding that CPA breached the contract on any of the aforementioned bases, did that breach amount to a material breach of the contract, which permits EDSI not to perform under the contract. Oak Ridge Constr. Co. v. Tolley, 504 A.2d 1343, 1348 (Pa. Super. 1985) (citing Restatement (Second) of Contracts § 237)). Here, where other facts are in dispute regarding the underlying breach itself, we shall also leave for the jury all questions regarding the materiality of CPA's alleged breaches of contract.

### 3.   EDSI's Fraud Claim

EDSI has alleged that CPA defrauded EDSI by including improper charges on its invoices. As noted, under Pennsylvania law, the elements of fraud are (1) a misrepresentation; (2) a fraudulent utterance; (3) an intention by the maker that the recipient will thereby be induced to act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damage to the recipient as a proximate result. E.g., Glover v. Severino, 946 A.2d 710, 713 (Pa. Super. 2008).

42

CPA acknowledged that it improperly included amounts in various invoices.  Hasting Dep. 66-69.  But CPA denies that they did it with the requisite intent.  Id.  CPA and EDSI also dispute which invoice entries are improper.  Compare Def.'s Mem. Ex. ¶ (CPA's assessment of improper charges in the invoices) with Def.'s Mem. at 17-25.  To resolve the question of intent with the evidence before us would oblige us to make credibility determinations that are the province of a jury.  Therefore, we will deny EDSI's motion for summary judgment as it applies to EDSI's fraud claim.

## III. Conclusion

In sum, we shall grant summary judgment in favor of EDSI as to all aspects of CPA's breach of contract claim except whether EDSI's June 6, 2006 letter extended the submission deadline for invoice #14.  We also grant summary judgment in favor of EDSI on CPA's promissory estoppel claims.

In all other respects, we deny EDSI's motion for summary judgment.

                    BY THE COURT:

                    /s/ Stewart Dalzell, J.

43

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARING PEOPLE ALLIANCE :  CIVIL ACTION
          :
    v.     :
          :
EDUCATIONAL DATA SYSTEMS, INC.:  NO. 07-1267

<u>ORDER</u>

AND NOW, this 29th day of September, 2008, upon consideration of defendant EDSI's motion for summary judgment (docket entry #34), plaintiff CPA's response, and EDSI's reply, it is hereby ORDERED that:

1. EDSI's motion for summary judgment is GRANTED IN PART consistent with the foregoing Memorandum;

2. In all other respects, EDSI's motion for summary judgment is DENIED; and

3. By October 6, 2008, plaintiff's counsel, after conferring with opposing counsel, shall ADVISE the Court by fax (215-580-2156) whether a settlement conference with the Court's Magistrate Judge would be fruitful.

BY THE COURT:


<u>/s/ Stewart Dalzell, J.</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CARING PEOPLE ALLIANCE          :          CIVIL ACTION
                                :
          v.                    :
                                :
EDUCATIONAL DATA SYSTEMS, INC.: :          NO. 07-1267

<u>JUDGMENT</u>

AND NOW, this 29th day of September, 2008, in accordance with the accompanying Memorandum and Order, and the Court having this day granted plaintiff's motion for summary judgment in part, JUDGMENT IS ENTERED:

1.   In favor of defendant Educational Data Systems, Inc. and against plaintiff Caring People Alliance as to plaintiff's breach of contract claim except as it pertains to the submission of invoice #14; and

2.   In favor of defendant Educational Data Systems, Inc. and against plaintiff Caring People Alliance, as to plaintiff's promissory estoppel claim.


BY THE COURT:


/s/ Stewart Dalzell, J.